Michael REED, Appellant,

v.

UNITED STATES, Appellee.

No. 11766.

District of Columbia Court of Appeals.

Argued March 20, 1979.

Decided May 22, 1979.

Rehearing and Rehearing En Banc
Denied July 27, 1979.

**726**

Richard A. Rosen, Public Defender Service, Washington, D. C., with whom Silas J. Wasserstrom, Public Defender Service, Washington, D. C., was on the brief, for appellant.

Regina C. McGranery, Asst. U. S. Atty., Washington, D. C., with whom Earl J. Silbert, U. S. Atty., John A. Terry, Peter E. George and James F. Hibey, Asst. U. S. Attys., Washington, D. C., were on the brief, for appellee.

Before KERN, YEAGLEY and HARRIS, Associate Judges.

KERN, Associate Judge:

On the evening of April 24, 1976, Carlos Gomez, a 16-year-old high school student, was attacked with a hammer and robbed near the Brentwood Shopping Center. It is undisputed that five other young men, Dame Sutton, Francis Robinson, Kim Johnson, Allen Dudley and Marshall Boyd, were present at the scene of the attack; all but Boyd testified at trial. Appellant was charged with armed robbery, robbery, assault with intent to kill while armed, assault with intent to kill, and mayhem. The jury, after hearing their testimony and that of the investigating officers and a family friend of the complainant who went to the scene the day following the attack and discovered the weapon used, convicted appellant of all charges.[1]

Appellant's argument on appeal that (1) the court improperly excluded from evidence certain written pretrial statements given by government witnesses to the police and (2) the prosecution engaged in misconduct during the trial requires us to focus in some detail on the testimony of these prosecution witnesses who had been present at the scene on the night of the crime.

Complainant Gomez testified to the jury that around 9 p. m., in the company of Dame Sutton, he was walking to the Brentwood Road High's store when they encountered Marshall Boyd "and a few other boys" whose names he did not know. Boyd asked the complaining witness to buy him a cake. Gomez and Sutton continued until stopped by appellant and Dudley who asked for money. Appellant, who was holding a paper bag with something in it, went through Gomez's pockets, removed his wallet and took a dollar, and Dudley knocked Gomez's glasses from his face, breaking them. Dudley and Sutton walked on to High's leaving complainant with appellant. At that point, according to the testimony of the complaining witness, "I turned away to walk" and he remembered nothing that happened after that.

The defense attorney commenced his cross-examination of complainant Gomez with the following colloquy:

Q. Mr. Gomez, you remember several times talking to the police officer at the hospital in connection with this investigation of this case?

A. Yes.

Q. Do you remember at least one time the police actually had you write everything you remembered, and had you write your answers to those questions?

A. Yes.

---

1. The government concedes, and we agree that the lesser-included offenses of robbery and assault with intent to kill must be vacated.

A written statement containing all of the questions and answers given by the complaining witness to the police was then identified as a defense exhibit. Counsel developed that this written statement was in several respects at odds with complainant's testimony, e. g., he testified he had been left with appellant *alone* after his wallet was taken but he stated in writing before trial there had been "around four" boys still with him after being robbed of his wallet.[2]

Defense counsel probed into other answers in complainant's written statement: that (1) he could identify only one, viz., Boyd, of the four boys with him just before the attack; (2) appellant had nothing in his hand (in contradiction to complainant's testimony that he [appellant] had held a paper bag); and (3) he could not identify who removed his wallet (whereas he testified appellant had).

Counsel on his cross-examination of the police officer who obtained the statement from the complainant again brought out to the jury the discrepancies between the testimony of Gomez from the stand and the statement in writing he gave to the officer in the hospital.

Dame Sutton testified that he met Gomez in front of his house and set off for High's on Brentwood Road. While Gomez stopped and talked "to somebody" in a "crowd of boys" standing in front of the liquor store in the shopping center, two boys "came out of the crowd" and confronted him; one, carrying something in a paper bag, was appellant and the other was Allen Dudley. Appellant, according to the witness Sutton, threatened "to burst me in the head" while menacingly holding up the bag unless the witness brought him a sandwich. Appellant then stopped Gomez and took his wallet. The witness continued on to High's with Dudley leaving Gomez "standing back by Murry's Steak with Michael Reed [appellant] . . . [who] still had [the bag] in his hand."

Francis Robinson took the stand and testified on direct examination that he was in front of the liquor store at the Brentwood Shopping Center with "a hammer" he had gotten from a friend "to go break into soda machines." He gave up the hammer, which was in a bag, to Allen Dudley "[b]ecause he said he was going to rob somebody." Subsequently, he met up with Dudley, Boyd and appellant and overheard appellant say "I killed someone. If you go back and tell I will kill you." The witness and several others went into the woods near Murry's Steak House and found complainant lying on the ground "bleeding" and "moaning and groaning" and thereafter ran to a fire station for help.

The prosecution elicited from this witness that he did *not* tell the truth in a statement he gave to the police during an interview prior to trial "[b]ecause I didn't want to be incriminated . . . [b]y the hammer."

On cross examination, the following colloquy occurred:

Q. Now, when you first were questioned by the police about this, you gave them a full statement; isn't that right?

A. Right.

Q. And at the time you never mentioned anything about the hammer.

A. No.

Q. You never mentioned anything about Michael Reed saying anything?

A. No.

Q. To Marshall Boyd?

A. No.

Defense counsel returned to the witness' written statement in his cross examination:

Q. Now, when you gave your statement to the police, they asked you to read it over carefully?

A. Yes.

Q. And they asked you if you wanted to add anything, or if there were any mistakes in it; is that right?

A. Yes, right.

Q. And you signed that statement, didn't you?

2. Complainant explained this discrepancy on the ground: "I was confused and I didn't know what he [the officer] was talking about."

A. Right.

Q. And you said it was true and accurate to the best of your recollection?

A. Right.

Q. And in that statement you said that the people you saw leaving High's were Dame Sutton, and two other boys whom you didn't recognize?

A. Right.

Q. You never mentioned Mr. Reed or Mr. Dudley at all, and the only person you ever mentioned was Dame Sutton; is that right?

A. Right.

Kim Johnson, a 14-year-old boy, testified that he was with Francis Robinson on the night in question and they had a sledgehammer "to break into some soda machines." Appellant and Dudley came up and appellant "snatched the sledgehammer from Francis." Subsequently, in the company of Robinson, he saw appellant, Boyd and Dudley and heard appellant say to Dudley, "If you snitch on me I am going to kill you." Thereafter, Robinson discovered the unconscious body of a person whom Boyd identified as the complainant Gomez.

The prosecutor developed on his examination of the witness Johnson the following:

Q. Kim, did you give a statement to the police?

A. Yes.

Q. Did you tell them the truth in that statement?

A. No.

Q. Why didn't you tell them the truth?

A. Because I was afraid that me and Francis [Robinson] might get in trouble.

On cross-examination, defense counsel elicited from the witness an admission that he had stolen the hammer from a vacant apartment in the Brentwood Apartments and that he had never mentioned in his statement to the police that anyone had a hammer at the time of the attack on Gomez. Counsel then had the witness identify his three-page written statement to the po-

lice, and obtained his further admission that in the statement no mention had been made of overhearing appellant threaten Dudley with death if he snitched.

Defense counsel further probed:

Q. Now, you testified before the Grand Jury and the first time you mentioned something that Mr. Reed is supposed to have said, you were promised that you would not be charged in connection with the theft or the use of the sledgehammer breaking into vending machines?

A. Yes.

Q. That is when you testified before the Grand Jury?

A. Yes.

Q. You never had a charge or anything in that connection with this case?

A. No.

Q. When you gave your statement to the police you said you didn't even know Mr. Dudley and Mr. Reed?

A. I knew Dudley, but I didn't know Michael Reed.

Q. That's right. You knew Dudley, but you didn't know Michael Reed?

A. Yes.

Q. You said you did know somebody named Little Man?

A. I know him as Little Man.

Q. And you were asked the question if you knew Little Man and you answered, "No."

A. I answered, "Yes."

Q. Let me show you what is page three of the statement that you gave to the police and ask you if it refreshes your memory about what you said?

A. I answered, "Yes."

Q. So you think that they, whoever took your statement simply got it wrong.

A. Yes.

Just prior to the close of the case and the court's instruction to the jury,[3] defense counsel moved into evidence "the statements to the Police of Carlos Gomez, Mr. Robinson and Mr. Johnson, all of which was

---

3. We do not at this point in the opinion summarize the testimony of Allen Dudley, who was a key prosecution witness, because no prior written inconsistent statement by him was identified at trial and moved into evidence by defense counsel.

used to impeach Government's witnesses. . . ." The court sustained the prosecutor's objection and appellant urges this ruling was error requiring reversal.

In 1974, this court pointed out that "the law in this jurisdiction" *required* the trial court to admit into evidence a witness' prior inconsistent statement, the accuracy of which is not denied. *Jefferson v. United States*, D.C.App., 328 A.2d 85, 87 (1974). There, we concluded that the trial court's refusal to admit into evidence as a defense exhibit the pretrial written statement of the complainant was harmless because "the evidence relevant to credibility [of such witness] was sufficiently placed before the jury and it was well aware of the existence and content of the prior statement." *Id.* at 86 (footnote omitted).

▆▆▆ Appellant, relying upon *Gordon v. United States*, 344 U.S. 414, 73 S.Ct. 369, 97 L.Ed. 447 (1953), argues (Brief at 15) that "[w]hatever the value of oral impeachment at trial, it cannot be denied that the impeaching statements would have been of far greater value had the jury been allowed to see them . . . ." However, in *Jefferson*, we rejected such an argument and concluded:

> Prejudice to appellant can occur, therefore, only if the court's error may have impeded the jury's full assessment, of . . . [complainant's] credibility. [*Id.* at 86, n.6.]

We are persuaded that in the instant case the jury was able fully to assess the credibility of complainant Gomez and the witnesses Johnson and Robinson because the jurors were thoroughly informed of (1) the material omissions from the pretrial statements of the latter two and (2) the specific discrepancies between the testimony of Gomez at trial and his pretrial statement on whether (a) he could identify the person who took his wallet, (b) whether that person threatened him with an object in a paper bag, and (c) how many people he was left with just before he was attacked.

Appellant strenuously argues that for this court to conclude the trial court's error in excluding the prior written statements was harmless is to circumvent the Supreme Court's ruling in *Gordon*. There, the Court concluded the trial court committed reversible error by the *combination* of *two* incorrect rulings: (1) refusing a defense request to order the prosecution to permit inspection and copying of a witness' prior written statement in conflict with his subsequent trial testimony, *and* (2) excluding from evidence a transcript of relevant prior criminal proceedings other than the trial in question at which a key government witness testified. The Court emphasized the crucial significance of this witness' testimony and viewed the trial court's rulings as keeping "from the jury relevant and important facts bearing on the trustworthiness of crucial testimony." *Gordon v. United States, supra* 344 U.S. at 423, 73 S.Ct. at 375.[4]

*Gordon* in our view is distinguishable from what we have here; the jury in the instant case was fully informed by both prosecution and defense of precisely how the respective statements made by each of the three witnesses differed from their testimony at trial. Under these circumstances the court's ruling that excluded the prior statements from evidence, while error, was not reversible error.[5]

---

4. The witness in *Gordon* did not implicate the defendants until giving his *fifth* statement before trial and this came after he pled guilty in the other case and received the admonition from the court to tell all—even if it might involve others.

5. We likewise reject appellant's argument that the court erroneously limited the closing argument of defense counsel to preclude full discussion by him of the alleged deal by the prosecution to obtain testimony from the witness Dudley. The matter was fully explored by counsel in their respective examinations of him on the stand; the defense attorney in his argument reminded the jury of the deal and wondered "How credible is a witness like that" and he argued Dudley was lying. The prosecutor readily conceded in his closing argument that "the Government has made an arrangement with Mr. Dudley" and invited the jury to "put yourself in our position. If there is evidence from a witness who is going to implicate the Defendant, the man who actually committed the beating, isn't that a fair trade?"

Appellant also urges his conviction must be reversed because the prosecutor was allowed to admit into evidence and then argue to the jury irrelevant, inflammatory and prejudicial evidence. The record reflects that in his opening statement the prosecutor characterized the complainant Gomez as "a talented young man, a young art student . . . [who] had hopes for the future . . . [and] had been rewarded for his art work."

The prosecutor on direct examination asked the complaining witness, over objection on grounds of irrelevancy, what school in addition to regular high school he was attending and elicited that he was studying "Advertising Art." The prosecutor then asked about awards complainant had received for his art work and where he was to be honored for a particular poster he had made. The defense attorney noted his "continuing objection to this line of questioning," which the court overruled.

When the prosecutor addressed the jury in his argument-in-chief he characterized the complainant as "[a] young man who had a particular talent . . . so talented that he was to be honored by the Presidential Commission," and wondered "how many young men in this City will ever be honored by a Presidential Commission at the Hilton Hotel. But he never made it, did he? . . Why, we are here today to find out and discover why he never made it."

The prosecutor in concluding his *rebuttal* argument reminded the jury:

Washington doesn't have any oil and gas, but it does have some resources, and those resources are young people. And Carlos Gomez was a very precious resource. A very precious resource.

It is not difficult to grow up in this world with family problems and poverty that when you have someone with a certain something, a certain talent to rid themselves and be a credit not only to the

community, but as an artist good enough to be honored by the Presidential Commission. And somebody who might be a great talented student or could have been. He can't see out of one eye. You heard him say it.

\* \* \* \* \* \*

Perhaps we have all learned something about courage and learned something about the courage of Carlos Gomez. *But I suggest to you that this community owes Michael Reed something for trying to scratch the community of one of its most precious resources, precious young people like Carlos Gomez and the appropriate verdict should be guilty on each of those Counts.* [Emphasis added.]

■■■ The prosecutor's suggestion to the jury "that this community owes Michael Reed [appellant] something for trying to scratch this community of one of its most precious resources" was an appeal to the jury to avenge the beating of Gomez in the name of the community.[6] The record reflects that this appeal to prejudice was *not* in response to any defense argument or otherwise uttered through haste or confusion in the heat of trial which is a circumstance that has excused inflammatory remarks in other cases. *See, e. g., King v. United States,* 125 U.S.App.D.C. 318, 320, 372 F.2d 383, 385 (1967). Rather, the inflammatory appeal by the prosecutor was previewed in his opening statement, *viz.,* complainant was especially talented and, inferentially, was worthy of special protection by the community, and evidence of this was developed on direct examination over objection of defense counsel. Given this background we deem the prosecutor's remark to the jury that "this community owes" defendant "something" to have been calculated to inflame the jury. Hence, we cannot excuse or condone it but conclude it constituted misconduct.[7] *Villacres v. United States,* D.C.App., 357 A.2d 423 (1976).

---

6. Ample evidence of the beating detailed the grave condition in which complainant was when removed to the hospital from the scene, the severity of his injuries, the permanent impairment of his vision and the amount of blood at the scene. Thus, the jury had heard substantial evidence of the savagery of the attack upon Gomez.

7. We reject appellant's other assertion of prosecutorial misconduct, *viz.,* the comment in argument by the prosecutor as to why Marshall

We are not persuaded, however, that this misconduct caused appellant prejudice now necessitating a reversal of the conviction and a retrial. Our task in assessing the impact of prosecutorial misconduct is to determine

> whether we can say "with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error." The decisive factors are the closeness of the case, the centrality of the issue affected by the error, and the steps taken to mitigate the effects of the error. [*Gaither v. United States*, 134 U.S.App.D.C. 154, 172, 413 F.2d 1061, 1079 (1969), *quoting Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946).]

*See Smith v. United States*, D.C.App., 315 A.2d 163, 166, *cert. denied*, 419 U.S. 896, 95 S.Ct. 174, 42 L.Ed.2d 139 (1974); and *Garris v. United States*, D.C.App., 295 A.2d 510, 512 (1972).

Given (1) the testimony of the victim that he was robbed by appellant, (2) the testimony of Dame, Johnson and Robinson that appellant threatened Gomez and Dame with the sledgehammer before the attack, and (3) the testimony of Robinson, Johnson and Dudley that appellant made incriminating admissions after being left alone with Gomez on the scene, we conclude the case fairly may not be deemed "close."[8]

The impermissible appeal to the jury consisting of the prosecutor's suggestion that it "owed" appellant "something" for what he had done to a valuable asset of its community was central to the very issue for the jury to determine—appellant's guilt or innocence. However, this misconduct occurred literally in the final minute of the prosecutor's rebuttal argument to the jury and was immediately followed, without pause according to the record, by the court's charge to the jury. The judge instructed the jury, among other things:

> You should determine the facts of this case by determining what did and did not happen without any prejudice and predisposition, and without any favor and without any fear and without any sympathy; but determine the facts of this matter fairly and impartially and objectively.

The first words of the court's charge to the jury literally coming on the heels of the prosecutor's inflammatory appeal were:

> Ladies and Gentlemen of the Jury, the trial in this matter has now been completed. All of the evidence has been introduced and identified and marked and all has been heard and received.
>
> It has been your duty and responsibility, of course, during the course of this trial to listen to the evidence as well as the argument *so that you might determine the guilt or innocence of the Defendant with respect to the matters that are alleged against him based upon the evidence and not based upon anything else.* [Emphasis added.]

When we apply the criteria of the test enunciated previously, we cannot say under the circumstances that it so prejudiced appellant as to entitle him to a new trial.

■ The judgments of conviction for robbery while armed, assault with intent to kill

---

Boyd (the *only* witness on the scene who did *not* testify at trial) was not called as a witness by the defense. It was made in the context of a reply to a defense argument suggesting the witnesses at trial may have been trying to protect Boyd by implicating appellant. Also, the record reflects that it was made during the heat of trial when reviewing courts have traditionally been more lenient towards remarks by counsel to the jury, and this comment was as a practical matter so buried in the argument as to have had limited impact on the jury.

8. Dudley testified that appellant got a bag from Francis Robinson and threatened to hit Sutton with it but the witness persuaded him to put the bag down. At that time the witness saw appellant holding the bag and talking with Gomez; later, appellant rejoined him and "said he just finished fighting a boy . . . [and] he didn't get but a dollar and some change." Dudley conceded on cross-examination he had not told "all" of the truth to the police after being arrested "[b]ecause I didn't want to get myself involved."

while armed, and mayhem are affirmed;[9] the judgments of robbery and assault with intent to kill are vacated.

*So ordered.*

9. Appellant has also asked us to review a "running resume" kept by Detective Plumb throughout the course of his investigation of this case. At trial, after Plumb's testimony, counsel moved pursuant to the Jencks Act, 18 U.S.C. § 3500, for its production. Except for some minor excerpts this motion was denied, but the entire report was sealed and placed in the record for our review. 18 U.S.C. § 3500(c). After a thorough examination of these materials we conclude that the trial court properly denied the motion to produce them. They did not relate, except for those parts revealed, to Detective Plumb's testimony. 18 U.S.C. § 3500(b). *See United States v. Nickell*, 552 F.2d 684 (6th Cir. 1977), *cert. denied*, 436 U.S. 904, 98 S.Ct. 2233, 56 L.Ed.2d 402 (1978). Furthermore, the trial court was correct in conducting an *in camera* examination to determine their discoverability. *Reed v. United States*, D.C.App., 379 A.2d 1181 (1977).