Edward J. FORD, Appellant,

v.

UNITED STATES, Appellee.

Veronica E. DAUGHTRY, Appellant,

v.

UNITED STATES, Appellee.

Nos. 82–789, 82–790.

District of Columbia Court of Appeals.

Argued Dec. 15, 1983.

Decided Dec. 31, 1984.

Kathryn Paull Brown, Washington, D.C., for appellant Ford.

Judith Mroczka, Public Defender Service, Washington, D.C., with whom A. Franklin Burgess, Jr., Public Defender Service, Washington, D.C., at the time the briefs were filed, were on briefs, for appellant Daughtry.

Daniel S. Seikaly, Asst. U.S. Atty., Washington, D.C., with whom Stanley S. Harris, U.S. Atty., Washington, D.C., at the time the brief was filed, Michael W. Farrell and Mark J. Biros, Asst. U.S. Attys., Washington, D.C., were on brief, for appellee.

Before NEBEKER, FERREN and BELSON, Associate Judges.

BELSON, Associate Judge:

On February 3, 1980, Milton Davis was found shot to death in an alley in Northeast Washington. In connection with the killing, appellants Edward Ford and Veronica Daughtry were charged with first-degree (premeditated) murder while armed, D.C. Code §§ 22–2401, –3202 (1981), first-degree

(felony) murder while armed, *id.*, and kidnapping while armed, *id.* §§ 22–2101, –3202. Ford was charged in addition with carrying a pistol without a license. *Id.* § 22–3204. After a jury trial in April 1982, Ford was convicted of all counts; Daughtry was acquitted of the murder charges but convicted of kidnapping. Ford's principal challenge on this appeal concerns alleged misconduct by the prosecutor in closing argument. Daughtry complains of some of the same prosecutorial arguments as well as certain cross-examination. She also contends that it was plain error to allow the prosecutor to impeach with her omission of certain central facts in a statement she gave to police after her arrest. Ford's conviction of kidnapping merges with his conviction of felony murder and must therefore be vacated.[1] Otherwise, the convictions are affirmed.

We set forth the evidence in detail since the strength of the government's case will be an important factor in evaluating appellants' claim of plain error. The government's theory of the case was that Ford and Daughtry, who were first cousins, plotted and carried out the killing of Milton Davis because Davis had been harassing their terminally ill aunt. The government's case was presented primarily through Ronnie Harris and William Hill, who testified under grants of immunity. Harris and Hill, ages 19 and 22, respectively, at the time of trial, testified that they had worked for the 34-year-old Ford, selling drugs and stealing cars. On February 3, 1980, they were at Ford's apartment smoking marijuana. Ford received a phone call, after which he told Harris his cousin was coming over. About 15 or 20 minutes later, Daughtry arrived and went into the bedroom with Ford. Ten minutes later Ford and Daughtry emerged. Ford said, "Come on. Let's go for a ride," according to Harris, or "Come on. We got something to do," according to Hill. At Ford's instruction, Hill

armed himself with a baseball bat. The four then got into Ford's Cadillac Seville, Harris behind the wheel, Daughtry in the front passenger seat, Hill behind Harris, and Ford behind Daughtry. They drove to the 400 block of Kentucky Avenue, S.E., and parked the car. Daughtry got out and went up the block. She returned a short time later walking Milton Davis by the arm.

Although differing slightly about the sequence of events, both Harris and Hill testified that Daughtry struck Davis. They agreed that Ford hit Davis with a pistol and pushed him into the back seat of the car. Both testified that Ford made a threatening remark to some bystanders about minding their own business. After Daughtry and Ford got back in the car, Harris pulled off. Davis was struggling and yelling, "Let me out." Hill struck him and told him to "shut up." Ford then pushed Davis down to the floor of the car and shot him twice in the back of the head. Harris drove into an alley and appellant Ford pulled the body out of the car.

The four then drove to 6th and H Streets, N.E., parking near Harris' home. They went to a Safeway to purchase some carpet cleaner. Harris attempted to clean the blood out of the car with a bucket and broom he got from his mother's house and with the carpet cleaner. Harris testified that the others went to a nearby pool hall while he was cleaning the car. Hill, on the other hand, testified that they went to a Chinese restaurant at 5th and H Streets, N.E. Harris and Hill agreed that eventually, the four of them returned to Ford's apartment. Not long after, Daughtry left. A few days later, Harris testified, he took the Seville to Lindsey Cadillac to have it cleaned.

Harris and Hill agreed generally that there was little discussion of the events surrounding the murder. Hill testified,

---

**1.** *Whalen v. United States,* 445 U.S. 684, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980); *Harding v. United States,* 460 A.2d 571 (D.C.1983); *Tribble v. United States,* 447 A.2d 766, 774–75 (D.C. 1982); *Ball v. United States,* 429 A.2d 1353, 1358 (D.C.1981). We therefore remand to the trial court to vacate Ford's kidnapping conviction.

however, that he understood Davis' killing had to do with a family matter, for he had heard Daughtry say that Davis was beating up someone. Harris testified that he had heard Ford say that Davis was harassing his aunt and that he (presumably Davis) "had gave him his word to leave her alone, and now he got God's word." Harris also testified that later on the day of the murder Ford got a phone call, after which he told Harris and Hill that Davis' body had been found.

Jean Lynch, a childhood friend of Daughtry, also testified for the government. She said that on February 3, 1980, she was visiting her mother at 442 Kentucky Avenue. Daughtry came in and asked her mother something. After no more than 10 minutes, Daughtry left. Shortly thereafter Lynch saw Milton Davis walk by and saw a woman slip her arm through Davis' arm. Lynch was not sure if the woman was Daughtry.

Lewis Johnson, who lived with Lynch's mother, testified that on the day in question a woman came to the house looking for Davis. He saw Davis walking down the block as the woman left. She and Davis then crossed the street to a car.

Betty McCormack, an employee of Lindsey Cadillac, identified some service order forms that indicated that a Cadillac under the name of Edward Ford had been serviced on February 25, 1980. The work done at that time included a shampoo of the entire interior of the car.

Detective Earl Drescher testified about the investigation of Davis' death and about certain statements made by Daughtry after her arrest. Dr. Rak Kim, a deputy medical examiner, performed an autopsy on Davis. He determined that Davis died of two contact gunshot wounds to the left rear of the head and ruled the death a homicide.

Both Daughtry and Ford took the stand to deny the charges. Daughtry, who had worked at the Government Printing Office for the past 15 years, testified that on February 3, 1980, Ford telephoned her to suggest that they visit their aunt. She drove to his apartment and then, along with Harris and Hill, got into Ford's car. As they were going up Kentucky Avenue, she told Harris to stop the car because she wanted to visit Jean Lynch's mother. She asked Lynch's mother to ask Davis to stop breaking into her aunt's apartment and to stop threatening the aunt. While there, Daughtry talked to Lynch, whom she had not seen in years.

Daughtry left the house and started back to Ford's car. As she did so she saw Davis walking toward her. She explained to him that her aunt was very sick and told him to leave her alone. When Davis acted as if he did not know what she was talking about, Daughtry told him to forget it and got back into the car. As she shut the door, she testified, "I heard all this commotion and the car sped off. I looked around, and I saw Milton Davis in the back." She became hysterical and "started screaming and hollering for them to let me out." Ford told Harris to stop the car, and as she got out Ford handed her money. At that moment, Daughtry testified, Davis was alive and sitting up between Hill and Ford in the back seat. Daughtry took a cab back to Ford's place, got in her car and drove home. That night another cousin, the daughter of the sick aunt, called and told her that Davis had been found dead.

In her defense, Daughtry also called four character witnesses, who testified that her reputation for truthfulness and nonviolence was excellent.

Appellant Ford generally corroborated Daughtry's testimony. He said that when Davis came to the car with Daughtry he said to him "that I represented the other side of the family, that I was the black sheep, and that it had come to my attention that he had been harassing my aunt." He asked Davis to get in the car because he wanted to talk to him about it and "make it clear that I wasn't going to tolerate him harassing her." Davis got in without a struggle, Ford said. He gave Daughtry

money to catch a cab "because she seemed upset. Why I don't know."

As they rode into Northeast, Ford continued, Davis assured him that he would stay away from the aunt. Ford warned him that if he came around there, "I was going to break both his legs and take him to the police if I catch him in the house." After this talk, Harris let Ford off at 5th and H Streets. Ford told Harris to drop off Davis and Hill and then wash the car, which he would not need until later. Harris then drove away with Davis and Hill. Ford went into a bar called Young's, where he had planned to meet a certain Bruce Hilliard. He stayed there talking to Hilliard and others until Harris returned with the car. He then drove home.

Ford also called as a witness Bruce Hilliard, who corroborated Ford's testimony about the meeting at Young's. Hilliard said he saw Ford arrive in a Cadillac Seville driven by Harris. Also in the car were Hill and a man Hilliard did not know. Only Ford got out of the car, Hilliard testified.

Trial counsel for both Ford and Daughtry attempted to discredit the testimony of Harris and Hill. In addition to the fact that their testimony was given under a grant of immunity, it was brought out that both men had shot at Ford and had firebombed Ford's house. Counsel were also able to bring out certain inconsistencies between Harris' testimony and Hill's. Also, Harris admitted that he had given a false statement to police in which he said that Daughtry was driving Ford's car on the day of the murder and that he (Harris) was following in a separate car.

## I

We turn first to the issues raised by appellant Daughtry. Her first contention is that it was plain error to permit the prosecutor to cross-examine her about her failure to tell police of her encounter with

Davis on the day of Davis' death. She relies on a line of cases in which we have held, following Supreme Court precedent, that before impeachment with previous omissions may be allowed, the government must establish a "threshold inconsistency" between the defendant's exculpatory testimony in court and the omissions in his statement to the police prior to trial. *Beale v. United States,* 465 A.2d 796, 804–05 (D.C.1983), *cert. denied* —— U.S. ——, 104 S.Ct. 1293, 79 L.Ed.2d 694 (1984); *Sampson v. United States,* 407 A.2d 574, 577 (D.C.1979) (per curiam); *Hill v. United States,* 404 A.2d 525, 530 (D.C.1979) (per curiam), *cert. denied* 444 U.S. 1085, 100 S.Ct. 1042, 62 L.Ed.2d 770 (1980).

The Supreme Court held in *United States v. Hale,* 422 U.S. 171, 95 S.Ct. 2133, 45 L.Ed.2d 99 (1975), and *Doyle v. Ohio,* 426 U.S. 610, 96 S.Ct. 2240, 49 L.Ed.2d 91 (1976), that an accused's silence in the face of police interrogation could not be used to impeach his trial testimony.[2] Where, as here, an individual has been arrested and given the warnings mandated by *Miranda v. Arizona,* 384 U.S. 436, 467–73, 86 S.Ct. 1602, 1624–27, 16 L.Ed.2d 694 (1966), his silence "may be nothing more than the arrestee's exercise of these *Miranda* rights. Thus, every post-arrest silence is insolubly ambiguous because of what the State is required to advise the person arrested." *Doyle, supra,* 426 U.S. at 617, 96 S.Ct. at 2244.

In *Hill v. United States, supra,* a defendant on trial for first-degree murder testified that he had shot the decedent in self-defense. Among other things, he testified that he had heard a shot and saw the decedent and two other men running toward him with handguns before he fired the fatal shot. The government established, through cross-examination and rebuttal by a police witness, that he had not included these details in his account of the

2. *Hale,* a case involving a robbery in the District of Columbia, rested on a finding that the probative value of the defendant's pretrial silence was outweighed by the prejudicial impact of admitting it into evidence. 422 U.S. at 173, 95 S.Ct. at 2135. *Doyle* held that such impeachment violated due process. 426 U.S. at 619, 96 S.Ct. at 2245.

incident to police. We held that the government's evidence established a threshold inconsistency between the material omission in Hill's statement to police and his later exculpatory testimony at trial. 404 A.2d at 532. We distinguished that situation from the defendants' complete silence in *Hale* and *Doyle*. Noting that Hill had talked freely about the encounter, we said:

[H]e may not purport to relate what happened and later claim that under *Doyle* his statement cannot be used to impeach him because it was incomplete. Its significance is for the jury to decide. What the appellant is asserting is a right to remain silent "selectively"; that is, as to some facts and not as to others. The right to remain silent is asserted properly by doing just what the *Doyle* court said a defendant should be able to do with the assurance that he will not be resultantly penalized, *i.e.,* remain completely silent. This Hill did not do.

*Id.* at 531–32.

In *Sampson, supra,* 407 A.2d 574, the defendant was accused of rape. At trial he presented an alibi defense through his own testimony supported by that of six witnesses. Over defense objection, the prosecution was allowed to establish through cross-examination and rebuttal testimony that Sampson had not related this alibi to police when questioned at the police station. This court reversed, finding no inconsistency between his failure to tell police his alibi and his trial testimony. Our holding rested on the fact that, unlike Hill, Sampson "made to the police a general denial of involvement with and knowledge of the crime but he made no statement concerning his whereabouts at the time during which the crime was committed." *Id.* at 579.

Similarly, in *Beale, supra,* 465 A.2d 796, we found no threshold inconsistency between a defendant's alibi testimony at trial and his failure to tell the authorities where he was at the time of the murder with which he was charged. *Id.* at 805. We noted that there was "nothing to indicate that it would have been 'natural' for [Beale] to mention his whereabouts at the time of the murder since there [was] nothing to indicate [Beale] knew when the shooting had occurred at the time he turned himself in to police." *Id.* Nevertheless, we held that in the absence of objection by the defense, the impeachment and subsequent argument by the prosecutor did not amount to plain error.

In this case, appellant Daughtry signed a form waiving her *Miranda* rights and agreeing to talk to police about her involvement with Milton Davis. Over the course of 2 hours, Detective Drescher testified, she:

made several statements to us, and one— the first of which is that she stated she knew who Milton Davis was. She stated that he had been bothering her aunt for some time, and she had spoken to him on several occasions attempting to try and get him to leave her aunt alone. Some of the times when she would try and talk to him, he would not want to listen, and he continued to bother her aunt. She had looked for Milton Davis on other occasions without finding him, *and she stated that about three days prior to when he was found dead, she had looked for him and she had a stick with her at that time.*

Tr. 524 (emphasis added). After 2 hours of questioning, Daughtry invoked her *Miranda* rights and the interview was halted.

Under cross-examination from the prosecutor, to which counsel did not object, Daughtry conceded she had not told the detective about going to Kentucky Avenue on February 3, 1980, and events that ensued that day. Daughtry now maintains that this cross-examination constituted plain error.

This case is distinguishable from *Hale, supra,* 422 U.S. 171, 95 S.Ct. 2133, and *Doyle, supra,* 426 U.S. 610, 96 S.Ct. 2240, in that Daughtry did not remain silent. On the other hand, she did not speak as freely as did the accused in *Hill, supra,* 404 A.2d

at 531. Daughtry argues that the facts are closest to those in *Sampson, supra,* 407 A.2d 574, and *Beale, supra,* 465 A.2d 796, in which the defendants offered an alibi defense at trial. Here, however, Daughtry's defense was not alibi. She admitted at trial to having been on the scene at least up until the time Davis entered Ford's car. Her contention is that she had merely been talking to Davis and played no part in his abduction.

■ In order for Daughtry's omission to constitute an inconsistency and hence permit impeachment, the prior statement must have failed to mention a material circumstance testified to at trial, which it would have been natural to mention in the prior statement. *Beale, supra,* 465 A.2d at 804–5; *Hill, supra,* 404 A.2d at 532 (citing McCormick, Evidence § 34 at 68 (2d ed. 1972). We think in these circumstances it would have been natural for Daughtry to mention the fact that she had been with Davis before he got into Ford's car on February 3, 1980. Unlike the defendant in *Beale,* Daughtry knew that the murder victim had been killed only hours after she saw him alive. We think that, knowing that fact, and having told the detective all that she did, it would have been natural to tell him also that she saw Davis on the day of his murder. We conclude that there was sufficient inconsistency between that omission and her testimony at trial to make it permissible to allow the jury to determine its significance.

■ Even if we were to assume it was error to permit this impeachment, we would hold that it was not plain error affecting Daughtry's substantial rights. *See Beale, supra,* 465 A.2d at 805; *Watts v. United States,* 362 A.2d 706, 709 (D.C. 1976) (en banc). Contrary to Daughtry's contentions, the evidence against her was strong.[3] In the first place, two eyewitnesses told of her direct involvement and con-tradicted her testimony on critical points. Daughtry herself admitted that she was upset that Davis had been harassing her aunt. From the disinterested testimony of Lynch and Johnson, it was clearly inferable that she went to Kentucky Avenue specifically seeking Davis, that she found him, and that she escorted him back to the car where her cousin and his two young henchmen waited. Her testimony that she got in the car and was suddenly surprised to find Davis in the back seat is inherently improbable.

Moreover, we think Daughtry overstates the significance of this impeachment, which was only "part of a lengthy trial involving numerous witnesses and producing transcript in excess of 1,000 pages." *Beale, supra,* 465 A.2d at 805. In contrast to the prosecutors in *Beale* and in *Sampson, supra,* 407 A.2d at 576, the prosecutor in this case made no reference in his closing argument to this impeachment. Trial counsel's failure to object also suggests that this impeachment did not figure so centrally in the conviction as appellate counsel would have us believe.

■ Daughtry also contends that plain error was committed by allowing the prosecutor to establish through cross-examination that Daughtry had not told her daughters, her cousin, her uncle, or anyone else except her mother, about the encounter of February 3, 1980. The government does not attempt to argue the propriety of these questions, but asserts that any error did not cause serious prejudice. We agree. As we explained in *Walker v. United States,* 402 A.2d 424, 426–27 (D.C.1979), such impeachment does not encroach upon the defendant's constitutional right against self-incrimination. In that case, the defendant was apprehended near the scene of a robbery. The defense was innocent presence. The defendant testified that he fled and falsely told police he lived at the house

---

**3.** Daughtry is correct that the evidence against her on the whole was not as strong as that against Ford. She overlooks the fact, however, that she was acquitted of the murder charges. There was considerable evidence of her role in the kidnapping, the one charge of which she was convicted.

where the robbery occurred because of the existence of an outstanding parole warrant against him. *Id.* at 425. We held that it was error to allow the government to cross-examine the defendant as to why he had not told his parole officer (whom he had seen subsequently) that he ran when the police arrived because of the outstanding warrant. In *Walker*, defense counsel had objected "vigorous[ly]" to the impeaching questions and the government had emphasized the point in closing argument. We nevertheless held that reversal was not required under the harmless error standard of *Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946).

We reach the same conclusion in this case. While the cross-examination in dispute lacked probative value, neither was it highly prejudicial. Trial counsel made numerous objections throughout this part of the examination, but not to these questions. Whereas in *Walker* the prosecutor emphasized the improper impeachment, 402 A.2d at 426, here the prosecutor made no mention of it at all in closing. Again, in light of the strong evidence and the unlikelihood that these questions swayed the verdict, we find no plain error.

Finally, with respect to the government's impeachment, Daughtry contends that the trial court erred in refusing to permit her mother to testify as to what Daughtry told her on the telephone on February 3, 1980, after the encounter with Davis. The trial court sustained the government's hearsay objection after argument and a 5-minute recess to consider the issue. Defense counsel proffered that the statement was not being offered for its truth but rather as tending to show the state of mind of defendant Daughtry. The trial court ruled that it was being offered for its truth and was not admissible under the state-of-mind exception to the hearsay rule.

■■■ The trial judge was correct in rejecting appellants' theory of admission. On appeal, Daughtry argues for the first time that her mother's testimony was admissible as a prior consistent statement. The trial judge gave appellant every opportunity to argue the admissibility of this particular testimony, excusing the jury to permit full discussion. Appellant's failure to advance in the trial court her present theory of admissibility precludes her from relying upon it here.[4]

II

■■■ Daughtry's other claims of error relate to alleged improprieties in the prosecutor's closing argument.[5] Since appellant Ford complains of the same points, we dis-

---

4. Even were we to entertain appellant's argument and also to agree with her that Daughtry's mother's testimony was admissible to show Daughtry's prior consistent statement, any error would be obviously harmless. Daughtry had already testified that she had recounted the day's events to her mother. Moreover, the testimony would have helped appellant little, if at all. The prior inconsistency here was an omission to state what appellant testified to at trial. The omission did not serve the purpose of establishing that Daughtry lied at trial when she said she was at Kentucky Avenue on the day of the murder and participated in events there. Instead, it tended to show that she withheld basic and crucial information from the police during a discussion of over 2 hours. Even testimony by her mother that Daughtry fully recounted to her an exculpatory version of the events on Kentucky Avenue would not have explained away Daughtry's crucial omission.

5. Daughtry also maintains that the prosecutor's cross-examination of her character witnesses was improper. The prosecutor began his examination of the first three of these witnesses by asking briefly if the witness had been with Daughtry on February 3, 1980. Each said he had not. Daughtry, although she made no objection at trial, now argues that these questions violated her right to put on a defense, guaranteed by the compulsory process clause of the Sixth Amendment. Alternatively, she argues that the questions should have been excluded because the probative value of the evidence was outweighed by the prejudice. We deem these contentions frivolous. We agree with the government that these questions were a proper attempt to establish the limitations of the character testimony—that is, that these witnesses could testify only regarding Daughtry's reputation, and were providing no directly exculpatory evidence.

cuss the contentions of both appellants in this section. Ford's separate allegations of prosecutorial misconduct we consider in part III of this opinion.

■ Initially, we note that with minor exceptions, the portions of the argument here complained of were not objected to at trial.[6] Accordingly, we may reverse the convictions only if there is misconduct so clearly prejudicial to substantial rights as to jeopardize the very fairness and integrity of the trial. *McCowan v. United States*, 458 A.2d 1191, 1196 (D.C.1983); *Watts v. United States*, 362 A.2d 706, 709 (D.C. 1976) (en banc).

The first point raised by Daughtry and Ford is that the prosecutor improperly invited the jury to infer that there were witnesses to Davis' abduction who were cowed into silence by the alleged threat uttered by Ford as he pushed Davis into the car. Both Harris and Hill testified that Ford had said to some bystanders, "Signifying is worse than stealing," with Harris having Ford add, "and don't think this can't happen to you." Hill testified that this meant that if the observers did not mind their own business the same thing would happen to them. The prosecutor, recalling this testimony, suggested that Ford's threat explained Lynch's reluctance to identify Daughtry as the woman who came up to Davis. He also said it explained why "you [the jury] didn't see people parading from the four hundred block of Kentucky Avenue running in here and testifying, did you, even though you heard they were all out there, because it is worse than stealing."

■ Appellants argue that these comments fall within the rule proscribing use of the missing witness inference unless it is first shown (1) that the witness is peculiarly within the power of the party to produce, and (2) that the witness' testimony is likely to elucidate the transaction in issue. *Dent v. United States*, 404 A.2d 165, 169–70 (D.C.1979); *Conyers v. United States*, 309 A.2d 309, 312 (D.C.1973), quoting *Graves v. United States*, 150 U.S. 118, 121, 14 S.Ct. 40, 41, 37 L.Ed. 1021 (1893). We agree with the government that this case is distinguishable from those cases. Rather than suggesting that there were witnesses whom the defendants were afraid to call because their testimony would be adverse, the prosecutor was attempting to explain the government's lack of corroborative evidence. As noted, there was evidence that some people were on the street as Davis was abducted, and that Ford threatened retaliation if they became involved. Thus, the prosecutor was expressing the view that it was fair to infer that Ford's statement kept some witnesses from testifying freely or testifying at all, for the prosecution. Even if we assume that this would not have been a fair inference, we are not persuaded appellants suffered substantial prejudice from it. Neither defense attorney apparently considered it so unfair as to call for objection.

Appellants also complain that the prosecutor appealed improperly to the jurors' sympathy for the deceased victim and to

**6.** At one point during the initial argument, Daughtry's counsel objected following comments about the testimony of Jean Lynch and Lewis Johnson. The trial judge instructed counsel to hold their objections until the conclusion of the arguments. When the prosecutor finished his initial argument, Daughtry's attorney objected that there had been "substantial misrepresentations of the testimony." She complained in particular of the prosecutor's characterization of Lynch's testimony. Ford's counsel merely added, "I would like to do the same as to Mr. Ford, state my objection." The court overruled the objections, noting that counsel could argue the evidence as they remembered it.

After the government's rebuttal argument, Ford's lawyer moved for a mistrial. When asked by the court to specify her objection, however, Ford's counsel said only, "I feel that Mr. Biros [the prosecutor] mischaracterized the evidence and also mischaracterized the closing arguments of other counsel. I would also submit, Your Honor, that the rebuttal was not—he did more than rebut. He should have done that in the opening closing argument." The court overruled the objection, stating that most of the rebuttal "was confined to the defense's theory in the case." Daughtry's counsel made no objection to the rebuttal argument.

their emotions in his final remarks in rebuttal argument.

After referring to the character testimony offered in behalf of Ms. Daughtry, he reminded the jurors of their obligation to avoid deciding the case on the basis of sympathy. Then he said:

Now, I have not waved this picture around in front of you, ladies and gentlemen, during the course of this entire closing argument, but at the end, I'm going to show it to you again, because if you're going to decide this case on sympathy, make sure, when you cast your vote, that you have a good look at this picture because sympathy, if you're going to take it into consideration for her and her position, then, my goodness, you take a look at Government Exhibit Number Six before you override the reasoned decision of the evidence and decide this case on sympathy.

This is not given to you to inflame your passions, make you think ill of anyone, but it is to say that's the man that was killed, and he's not here, and his family is not here, and he's been deprived of his last living breath on February 3rd. So if you go back there and people start talking about what a nice lady she is— and she's not on trial for being a bad lady. She's on trial for what she did on that day. That's all. It's not what she did all her life, or what she made of the rest of her life. She's not on trial for that. She's on trial for what she did February 3rd, 1980. That's it. You're not judging her as a human being. You're just saying did she do it, what the Government and what other witnesses said she did. That's all.

If you're going to decide on sympathy, I ask you to take a look at that picture before you vote, not to inflame your passions, but to balance the scales, because one person is not here to talk, and all you have left to him is that picture; and for what she did, this woman, and that man, on February 3rd, 1980, I ask, and the evidence says you should convict her of each and every count that she's charged with.

Thank you.

Tr. 957–59.

 It is well settled that remarks calculated to arouse passion or inflame the jury constitute prosecutorial misconduct. (*Duane*) *Dyson v. United States*, 450 A.2d 432, 438 (D.C.1982); *Reed v. United States*, 403 A.2d 725, 730 (D.C.1979). Nevertheless, we have abided objectionable prosecutorial remarks when they came in response to arguments made by the defense. *Turner v. United States*, 443 A.2d 542, 554–55 (D.C.1982), *and cases cited therein*. The above comments are of the type generally to be avoided by the prosecutor. At the same time, it is clear that they were directed toward defendant Daughtry, whose counsel had herself appealed to the jury's sympathies. In her opening statement, Daughtry's attorney had noted that Daughtry was "the mother of three young daughters," and had called the jury's attention to the daughters' presence in the courtroom. In closing argument Daughtry's counsel returned to this subject, asking the jury to "[b]ear in mind the kind of woman she is. Bear in mind what she has accomplished in her life. She is thirty-nine years old, has raised three daughters, has worked and has worked hard at the Government Printing Office to get to the position that she has attained." We do not say that defense counsel's argument was improper, since she argued to the good character of the appellant Daughtry, and obtained a jury instruction on character. She later related it to the credibility of the competing witnesses. She argued: "Is this ... the type of woman who would in cold blood, with premeditation, plan a murder? Is this a woman who would plan a kidnapping?" While not improper, counsel's argument nevertheless easily could have aroused the sympathies of the jurors.

 In that context, we do not think it was improper for the prosecutor to remind the jury that a man had been killed and that the issue was not what Daughtry "did

all her life, or what she made of the rest of her life" but rather, "[D]id she do it." The prosecutor is obliged, however, to counter the defense argument in a manner that is not unduly prejudicial.

 Assuming that the prosecutor went beyond what would have been an appropriate response, particularly in calling attention to the photo of the murder victim, we face the question whether his comments were so prejudicial as to jeopardize the fairness of the trial. *Watts, supra,* 362 A.2d at 709. We think not. Daughtry's counsel, against whose client the remarks were directed, made no objection even though they came at the very end of rebuttal. We take this as confirmatory of our own impression that the remarks were not egregious. Ford's counsel, while moving for a mistrial, made no specific reference to this argument.

With respect to appellant Daughtry, we conclude that any misconduct in the prosecutor's arguments did not result in substantial prejudice to her defense. The trial court instructed that arguments of counsel are not evidence, and, as we explained above, the evidence against her was strong. *See Villacres v. United States,* 357 A.2d 423, 428 (D.C.1976).

With respect to appellant Ford, before stating our conclusions, we address his separate contentions concerning the closing arguments.

### III

 Ford contends that the prosecutors made improper comment on his two prior murder convictions. While discussing (on rebuttal) the credibility of Ford's account of his meeting with Hilliard, the prosecutor said this:

Whether that meeting happened on that day or another day, you have only two people to believe—Mr. Hilliard, who's a friend of Mr. Ford, and Mr. Ford.

Now, Mr. Ford—and it's true. Don't take his two prior first degree murder convictions and say, "My God, because he did those, he did these," okay? That's

not the law, but the law is—and you weren't told this exactly, but His Honor will tell you—that you may consider them in determining whether the man is telling the truth. You may consider them. So it's not like you've got to take them and throw them away forever, but you consider them in that manner. Here's a man on trial for first degree murder who twice has been convicted of first degree murder, and robbery and drugs. All right.

He tells you this—I had this meeting. All right.

In this jurisdiction, prior convictions are admissible to impeach a defendant, although not to prove that he is guilty of the crime with which he is charged. *Fields v. United States,* 396 A.2d 522, 527 (D.C. 1978); D.C.Code § 14–305(b)(1) (1981). The risk of jury misuse of previous conviction impeachment is at its greatest when, as in this case, the crime charged and the crime used to impeach the defendant are similar. *Fields, supra,* 396 A.2d at 527.

 To minimize this risk, the prosecutor must not impeach the defendant with prior convictions in a manner which suggests to the jury that because of his prior criminal acts, the defendant is guilty of the crimes charged. *Id.* We agree with appellant Ford that the same rationale precludes a prosecutor from suggesting in closing argument that the jury should infer criminal disposition from the evidence of prior crimes.

 We conclude, however, that the prosecutor in this case did not violate this precept. His remarks came in the midst of a discussion concerning Ford's credibility. *See Baptist v. United States,* 466 A.2d 452 (D.C.1983). In addition, the prosecutor correctly told the jurors that they could consider Ford's prior convictions "in determining whether the man is telling the truth" but not to infer that "because he did those, he did these." It is significant that Ford's counsel did not object, as could have been expected if the prosecutor had suggested by means of facial expressions or voice intonation, a message different from that

conveyed literally by his words. While the prosecutor skirted danger here, adding "[h]ere's a man on trial for first degree murder," we are not persuaded that these comments amounted to error.

▮ Ford's remaining contentions merit only a brief discussion. He complains that the prosecutor misrepresented the evidence. Of the three specific statements complained of, two had to do primarily with the involvement of Daughtry, who does not raise them here.[7] The third alleged misstatement concerned a minor discrepancy over whether Hill gave the name of the Chinese restaurant to which he testified they had gone after the shooting. We find no misconduct in these remarks.

▮ In a similar vein, Ford argues that the prosecutor made himself a witness by stating facts outside the record. Again three instances are cited. The first is that the prosecutor said that Ford got a gun from the trunk of the car before going to Kentucky Avenue. While it is true no such evidence was offered, Ford's counsel had sought to obtain Hill's admission that he had stated previously this very fact.[8] We think that this was most likely an inadvertent and, under the circumstances, understandable, mistake. Trial counsel neither objected nor attempted to correct it in her argument. The other two remarks cited in this regard, we conclude, involved the drawing of permissible inferences from the evidence.[9]

In conclusion, as to appellant Ford, we find that he suffered no substantial preju-

---

7. The first is the prosecutor's statement that witness Lynch said Daughtry walked arm-in-arm with Davis. While Lynch did not directly make such a statement, it was inferable from her testimony. In any event, Daughtry admitted that she met Davis immediately after leaving Lynch.

 The second statement was that, according to the witnesses, Daughtry "muscled on to" Davis and walked him to the car. Again, this was not an unreasonable inference to draw, particularly in light of Dr. Kim's testimony that Davis was intoxicated at the time of his death.

8. Ford makes a different, probably inconsistent, argument with respect to this point. On cross-examination, Hill testified that the first time he saw the gun that was used in the killing was on Kentucky Avenue. Ford's trial counsel then attempted to impeach Hill by asking him what he had told her—counsel—at the jail on a previous occasion. It is apparent from the transcript that Ford's lawyer was seeking an admission that Hill had told her that he first saw Ford getting the gun out of the trunk of his car before the four of them drove over to Kentucky Avenue. The alert trial judge, however, cut off counsel before she completed her question. The judge explained that she was in danger of putting herself in a position where she could be called to testify. After the government objected, the court stated, "Well, I sustain the objection for your own benefit on that." Ford argues on this appeal that the trial court's action violated his Sixth Amendment right to confront the witness.

 We think in the circumstances the trial judge's actions were entirely appropriate. The attempted impeachment did risk involving the attorney as a witness, with attendant complications.

Counsel stated that she did not intend to testify if Hill denied having made the statement. Counsel was able ultimately to ask substantially the same question about when Hill first saw the gun simply by omitting reference to the pretrial conversation.

Moreover, as the government points out, it is hard to imagine how testimony that Ford took the gun out of the trunk of the car *before* driving to Kentucky Avenue could have helped Ford's defense to the charge of premeditated murder. Counsel had many other avenues of attack on Hill's credibility not fraught with such risk.

We find no error here, and certainly no violation of Ford's constitutional right to confront the witnesses against him.

9. In her argument, Ford's counsel had argued that the medical examiner's failure to mention any laceration in the back of Davis' head refuted Harris' and Hill's testimony that Ford had struck Davis with a gun. The prosecutor countered that this was not unusual since Davis' skull had been "cracked" or "fractured" in that area by the two bullets.

 Similarly, defense counsel had suggested that it was probably Hill who had fired the fatal shots since he had been sitting to Davis' left, and the head wounds were on the left side. The prosecutor's argument and demonstration on this point were intended to show simply that the position of the wounds was not inconsistent with Ford's having been the killer.

 Appellant Ford also argues that the prosecutor injected improperly extraneous issues in his comments regarding the purposes of the felony murder rule, that he implied defense counsel did not believe her client, and that his com-

dice to his defense from the prosecutor's closing arguments. While the prosecutor was at the bounds of proper argument in the reference to Ford's prior convictions and in the attempt to defuse any undue sympathy the jurors might have felt toward Daughtry, there was no substantial misconduct. Moreover, the evidence against Ford was very strong. Two eyewitnesses identified Ford as the man who shot Davis. Ford's own testimony suggested that, aside from himself, the only possible suspects were Harris and Hill. But all the evidence pointed toward Ford as the one with a motive to kill Davis, and also tended to show that Harris and Hill were present only to do Ford's bidding. Given such strong evidence, we think the verdict could not have been swayed by these relatively minor improprieties in the prosecutor's closing argument.

*Affirmed.*

ments on the number of autopsies performed by the deputy medical examiner were inflammatory. We find these contentions to be without merit.