**Carlton B. CHATMON, Appellant,**

v.

**UNITED STATES, Appellee.**

**Nos. 96–CF–979, 98–CO–1445.**

District of Columbia Court of Appeals.

Argued March 7, 2000.

Decided June 27, 2002.

94

Douglas Wham, Washington, DC, appointed by the court, for appellant.

Barbara A. Grewe, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher and Frederick W. Yette, Assistant United States Attorneys, were on the brief, for appellee.

Before WAGNER, Chief Judge, and FARRELL and RUIZ, Associate Judges.

RUIZ, Associate Judge:

After a jury found him guilty of armed robbery[1] and first-degree felony murder while armed,[2] appellant received concurrent sentences of incarceration of fifteen years to life for armed robbery and thirty

---

1. *See* D.C.Code §§ 22–2901 and –3202 (1996) (recodified as D.C.Code §§ 22–2801 and –4502 (2001)).

2. *See* D.C.Code §§ 22–2401 and –3202 (1996) (recodified as D.C.Code §§ 22–2101 and –4502 (2001)).

years to life for felony murder while armed,[3] concurrent with any other sentences.[4]

Appellant contends in his direct appeal that the prosecutor's rebuttal argument was improper and that the resulting prejudice requires reversal of his convictions. In his appeal from the trial court's denial of his post-trial claim that his counsel was constitutionally ineffective, appellant contends that counsel precipitated the introduction of an extremely damaging eyewitness identification and failed to object to either the introduction of graphic color autopsy photographs of the murder victim, or, more importantly, the prosecutor's use of those photographs in conjunction with improper statements during rebuttal argument.

We agree with the trial court that the prosecutor's conduct in needlessly displaying gory photographs of the decedent coupled with his charged contemporaneous statements to the jury during rebuttal argument was improper, and that defense counsel should have objected. We also conclude that defense counsel's questioning introduced an identification of appellant as the shooter, which had been excluded by agreement *in limine,* that significantly strengthened the government's case, constituting ineffective assistance of counsel under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). We therefore reverse and remand for a new trial.[5]

## I. Facts

Kevin McGill, who also participated in the crime, was the central government witness at trial. He had entered a plea of guilty to second-degree murder while armed, and as part of his plea agreement, agreed to testify against appellant.

McGill testified that on the morning of July 9, 1993, appellant pulled up to a recreation center in a gray Honda Accord and told McGill that he had a "sweet" place to rob, and asked McGill if he wanted in on the robbery. McGill agreed. They drove to The Corner Market, a convenience store at 1499 Howard Road, SE, owned by Henry Choi. That morning Kwang Ahn, a friend of Choi, had gone to the store to meet Choi for a game of golf. Ahn helped serve customers while they waited for Choi's wife to come to the store so they could leave for their golf game.

McGill testified that he went into the store first, followed by appellant, who was carrying a shotgun. Two customers were in the store at the time, both of whom saw appellant with the gun, but they continued making their purchases. McGill got into the line as if to make a purchase. As customers were still in the store, McGill assumed the robbery was called off and began to walk out. McGill then heard a "pop," turned, and saw Ahn holding his stomach and falling to the floor while appellant stood three to four feet from where

---

3. Appellant was acquitted of possession of a firearm during a crime of violence. *See* D.C.Code § 22–3204(b) (1996) (recodified as D.C.Code § 22–4504(b) (2001)).

4. Shortly before these convictions, appellant had been convicted of distribution of cocaine and possession with intent to distribute cocaine, and concurrently sentenced to four to twelve years on each count. These convictions were affirmed on appeal.

5. Because we reverse and remand on the ineffectiveness claim, we need not reach appellant's other evidentiary and instructional claims relating to the introduction of a photograph with a police identification number or the sufficiency of evidence for an aiding and abetting instruction.

Ahn had fallen.[6] McGill did not actually see appellant fire the gun because his back was turned and he was almost to the door when it went off. According to McGill, appellant told him that he shot Ahn because he tried to grab the gun away from him.

The two men then ran to the cash registers which were located behind bullet-proof glass at the back of the store. Appellant pointed the gun at Choi while McGill took approximately $500 from the till. McGill left the store, followed by appellant, and the two got into the Honda and drove up the hill and over to Bowen Road. They divided the $500 and parted. McGill testified that he drove the Honda after the robbery, but gave a confusing account of who had driven to the store originally and who had the keys to the car.

McGill told the police detectives investigating the case that the gun used in the murder, the "neighborhood gun," was stored in a rooming house on Bowen Road where appellant "hung out." McGill admitted that he was quite familiar with the gun, knew where it was stored, and had held, carried, and fired it before the robbery. Based on McGill's information, the police obtained a warrant and recovered the shotgun from a kitchen cabinet at the rooming house. McGill identified the shotgun as the one appellant used in the robbery. Evidence retrieved from the shotgun was "consistent" with a round of live ammunition and shotgun wadding found at the crime scene as well as shotgun pellets recovered from the decedent's body during the autopsy. No fingerprints were recovered, however, and no scientific or technical evidence conclusively linked the shotgun found in the rooming house to the gun used in the crime.

Choi testified at trial that he was in the back of the store on the telephone with his wife when he noticed a customer come into the store and heard the boom of a shotgun. He then saw the gun pointed at him and two men running toward him who took money out of two cash registers. As they left, Choi followed them out of the back part of the store and he saw his friend on the floor. After he called 911, Choi ran outside the store in time to see a car pulling away and heading up the hill.

Choi further testified at trial that he would not recognize the individuals who robbed his store and shot his friend, but gave a general description: both men were black, the man who held the gun had shoulders that were "a little bit broad" hair a "little bit" long, and weighed more; the other was shorter and had narrower shoulders.

Michael Walker, who had lived across the street from the store for about twelve years, testified that from his house he could see the front door of Choi's store. On the morning of the robbery, he was on the telephone in an upstairs room at the front of the house and noticed that the store was busy, but that eventually traffic slowed down. He saw a brown-skinned, male teenager of medium build standing in front of the store who "kept turning around [and] looking back and forth," which made Walker suspicious. The young man looked into the store, then walked around the corner out of view, and returned carrying what appeared to be a rifle. Walker called 911 to report a robbery in progress, and while still on the phone, heard a "boom" and told the operator that he thought someone had been shot. A few seconds later, Walker saw

___

6. McGill also testified, somewhat inconsistently, that when he turned, Ahn was already lying on the floor.

two black teenagers run from the store; the one who had carried the gun into the store ran out first, but without the gun, and the other followed carrying the gun Walker had previously seen. The two ran around the corner of the building, and soon after, Walker saw a Honda with tinted windows speeding out of the store parking lot and making a right hand turn on Howard Road. Walker could not identify the two men.

Detective Roderick Wheeler of the Metropolitan Police Department testified that appellant was first interviewed on July 13, 1993, four days after the shooting, but was not then a suspect in the killing. The government introduced a written statement that appellant gave to the police on that day. Appellant said that he had seen McGill on the morning of July 9th, but that McGill drove off without speaking to him, and appellant went back to sleep until 11:45 a.m. After he awoke, appellant ran into a friend named "Jeffery" with whom he went "uptown until it was getting dark." When they returned, he heard from people in the neighborhood that someone had been killed.

Detective Wheeler further testified that in the statement appellant acknowledged that he had been in a "tannish-brown" Honda with McGill on previous occasions, but not on the day of the robbery. According to appellant, "every time people see [appellant] or see the car they automatically think I'm with him. People think me and Kevin are the best of friends. We are not the best of friends but I'm just making him think that." During his interview with Wheeler, appellant described the shotgun from the rooming house in detail and admitted having held it before, but claimed never to have shot it. He said that although he did not see McGill with a gun the morning of the shooting, he had in the past seen him with "a shotgun, a nine

millimeter, and a .22 caliber rifle." Appellant said he was aware people were saying that he and McGill had something to do with the death of the Korean merchant (referring to Ahn), but he told Wheeler that people just assumed he was in the car with McGill that morning. In his written statement, appellant denied having been present at all during the robbery. He also stated that he noticed that after the robbery, McGill began to act suspiciously, and did not come around the neighborhood as regularly as he had in the past.

Detective Wheeler also testified that, a few days after the robbery, Choi had made a positive identification of appellant and McGill from a photo array. When confronted with the English translation of a statement written by Choi in Korean that the identification was tentative because the robber had longer hair than the man in the picture, Wheeler added that when interviewed, appellant had said that he had "all of [his] hair cut off" a few days after the date of the robbery.

After his arrest, appellant gave a videotaped statement, which was played for the jury. In this statement, appellant said that on the morning of July 9th, McGill invited appellant to go with him to the "shopping center" to rob a store, but that McGill left without him while appellant was taking out the trash. Appellant then jogged over to the shopping center to see what McGill was doing, observed McGill and what appeared to be another person from outside the store, and saw McGill shoot Ahn. He claimed he saw McGill and the other man run out of the store, get into the Honda and drive away. Appellant then ran away from the scene. He again denied any participation in the robbery.

## II. Improper Prosecutorial Argument

Appellant claims that during rebuttal argument the prosecutor improperly showed

to the jury enlargements of graphic and inflammatory color photographs of Ahn's body lying on the floor of the Corner Market, soaked with blood, without any legitimate purpose. The transcript in this case provides us with the trial court's description of what transpired in the courtroom during the prosecutor's rebuttal. The judge clearly was concerned not only by the gory photographs themselves, but also by the manner in which the prosecutor used them during closing and rebuttal. After instructing the jury, the judge called the lawyers to the bench to discuss an additional instruction in response to the rebuttal argument, giving a description of the prosecutor's conduct:

> THE COURT: I have been doing a difficult thing which is that my mind has been on whether or not I should have interrupted [the prosecuting attorney] at one point. I am wondering whether to give an instruction with regard to it.... I was troubled by the number of times that [the prosecutor] picked up the photograph, admittedly there were no objections made in the trial, before the trial, to any of these bloody, gory photographs, and for reasons known only to [defense counsel], and so the jury has seen them many times during the trial. But [the prosecutor] seemed to be using—I wasn't sure what you were doing with the bloody photographs. For example, the most recent time you used it is you began your rebuttal argument by saying [defense counsel] asked you to render a verdict you can live with and as you said that, *no particular probity [sic] with regard to any evidence in this case except to inflame the passion of the jury,* you picked up this enlarged photo of the decedent lying in a huge pool of blood on the floor and walked down the jury row displaying it in the face of each of the jurors *not making any point about ballistics or distances, or any-*

> *thing else, but presumably asking them to render a verdict that they could live with* sort of repeating [defense counsel's] call for them to do that indicating to them by holding up the photograph how could you live with anything other than voting for us, *I found it completely inappropriate.*

> There wasn't any objections, I didn't say anything and you picked the photograph up at least two other occasions, maybe during your argument, and sort of walked about with it *for no apparent purposes.*

(emphasis added). The court then asked the prosecutor to respond to these observations.

> THE COURT: Why did you have to pick [the photograph] up?

> THE PROSECUTOR: Well, it is evidence, Your Honor, they are going to see the photographs, and it was—

> THE COURT: Yes, they are. So they are entitled to get a good healthy dose of blood during your argument, is that your point?

> THE PROSECUTOR: Your Honor, I was showing the photograph because that's what this crime is about. Mr. Aun [sic] was killed brutally and that's the point.

The court then proposed to give an instruction to the effect that the nature of the charges should not inflame the jurors in their deliberations.

> THE COURT: I don't know what to do—there wasn't any objection and he is right that the photographs are in evidence and—so I don't know.

> DEFENSE COUNSEL: I saw at least two jurors divert their eyes when the photographs were shown, I would like [an instruction].

Hearing no objection from the prosecutor, the court then gave the following instruction:

> But let me add as we turn to the logistics and the rules of the jury room and the deliberation process, you are cautioned about not letting the nature of the charge, a serious one involving the violent death of a person, to affect your verdicts. You are to consider only the evidence that's been presented in this case in rendering a fair and impartial verdict. The nature of the charge in the kind of case this is should not inflame you, you are to base your decision on the evidence in the case.

### A. Standard of Review

■ When reviewing an allegation of prosecutorial error, this court first determines whether the challenged actions or comments were improper. *See Freeman v. United States*, 689 A.2d 575, 584 (D.C. 1997). If so, the court must, viewing the remarks in context, consider 1) the gravity of the impropriety, 2) its relationship to the issue of guilt, 3) the effect of any corrective action by the trial judge, and 4) the strength of the government's case. *See id.* (quoting *McGrier v. United States*, 597 A.2d 36, 41 (D.C.1991)).

■ Where appellant did not preserve the objection, we reverse only for plain error, *i.e.*, if the misconduct "so clearly prejudiced" the appellant's substantial rights "as to jeopardize the fairness and integrity of his trial." *Irick v. United States*, 565 A.2d 26, 32 (D.C.1989). Reversal for plain error in cases of alleged prosecutorial misconduct is confined to "particularly egregious situations." *Id.* (quoting *United States v. Young*, 470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). That is, "reversal under the plain error doctrine is justified only in exceptional circumstances where 'a miscarriage of justice would otherwise result.'" *Harris v. United States*, 602 A.2d 154, 159 (D.C.1992) (en banc) (quoting *United States v. Frady*, 456 U.S. 152, 163 n. 14, 102 S.Ct. 1584, 71 L.Ed.2d 816 (1982)).

■ Appellant argues that even though defense counsel did not object either during or immediately after the prosecutor's rebuttal argument, he satisfied the requirement for a contemporaneous objection to preserve the argument on appeal by agreeing with the judge, who *sua sponte* raised the need for a curative instruction. The conventional requirement is that a defendant "take his objection at the earliest possible opportunity when, by doing so he can enable the trial judge to take the most efficacious action." *Hunter v. United States*, 606 A.2d 139, 145 (D.C. 1992) (quoting *United States v. Briggs*, 457 F.2d 908, 911 (2d Cir.1972)). However, we have relaxed this requirement in the case of closing arguments in order to avoid disruptive interruptions. An appropriate objection or motion at the bench at the conclusion of the prosecutor's presentation is sufficient to preserve the point for appeal. *See id.; Irick*, 565 A.2d at 32 n. 13. Appellant did not make a contemporaneous objection, nor did he object at the end of the closing argument. Instead, responding to the court's comment that it was considering whether to give a curative instruction, appellant agreed that an instruction would be appropriate, but expressed no preference as to its content and did not object to the instruction that the trial judge gave.

■ Appellant states that because defense counsel made his position known in time for the judge to at least consider taking corrective action, we should review for harmless error. *See Kotteakos v. United States*, 328 U.S. 750, 765, 66 S.Ct. 1239, 90 L.Ed. 1557 (1946) (noting that

error will be ground for reversal where the appellate court "cannot say, with fair assurance, after pondering all that happened without stripping the erroneous action from the whole, that the judgment was not substantially swayed by the error"). The government urges that it is illogical that appellant's acquiescence in the court's action at trial preserves an objection to that action, and that our review should be limited to plain error.

■■■ The purpose of the requirement of timely exceptions to trial errors is to alert the trial court and give it an opportunity to correct the error. *See (Linwood) Johnson v. United States,* 387 A.2d 1084, 1089 (D.C.1978) (citing *Pennsylvania R.R. Co. v. Minds,* 250 U.S. 368, 375, 39 S.Ct. 531, 63 L.Ed. 1039 (1919) and *Allis v. United States,* 155 U.S. 117, 122, 15 S.Ct. 36, 39 L.Ed. 91 (1894)). Notwithstanding defense counsel's inaction, appellant in this case benefits from the supervision of the trial by an attentive judge who broached *sua sponte* the subject of his discomfort with the prosecutor's rebuttal argument. We have often noted that in considering claims of improper prosecutorial argument, we do not review the prosecutor's actions, but those of the trial court in responding to the prosecutor's comments. *See McGrier,* 597 A.2d at 40. This court's role is to determine "whether the trial judge should have intervened if and when the prosecutor went beyond the limits of permissible argument." *Id.* Here, the trial judge did intervene by considering the propriety of the prosecutor's comments and actions and giving a curative instruction. Thus, the appropriate standard of review is harmless error and not plain error. *See id.* at 41.[7]

## B. *Were the prosecutor's actions improper?*

■■■ In making its case to the jury, the government is not required to deliver a dispassionate presentation of sterile facts. The gritty reality of the crime, including its human toll, is relevant to the jury's consideration. *See Dixon v. United States,* 565 A.2d 72, 76 (D.C.1989). As with all matters presented to the jury, however, undue prejudice must be taken into account to ensure that the jury's verdict is based on the evidence and law, and not the emotional response of inflamed passions. *See id.* at 77–78. The trial judge, observing what transpired, thought that the prosecutor's actions crossed that line, said so on the record, and decided that the transgression was serious enough to require a cautionary instruction, which he gave without objection from the prosecutor.[8] While the government argues that defense counsel failed to object and there-

---

7. We emphasize that the issue before us is the adequacy of the trial court's curative instruction, not whether *any* such intervention by the trial court would have sufficed to remedy the prosecutor's actions. Were appellant's position that no curative instruction would have been adequate, we might well view differently the legal effect of his counsel's failure to object during the government's rebuttal—assuming that the trial court permitted such mid-argument objections—at a point when the trial court could have stopped the offending behavior before it was capable of seriously affecting the jury's impartiality.

8. On appeal, the government for the first time argues that appellant has incorrectly identi-

fied the photographs that the prosecutor presented to the jury during rebuttal. The trial court contemporaneously described the photograph as an "enlarged photo of the decedent lying in a huge pool of blood on the floor." The prosecutor did not quarrel with the trial court's description, nor did he argue, as the government does on appeal, that it was one of the less objectionable pictures of the dead man. Regardless of which precise photograph was used, the trial court's undisputed description suffices for purposes of our analysis of the prosecutor's use of photographs of the shooting victim during rebuttal argument.

by acquiesced in the trial court's action—which we discuss below—we also think that the government, having not objected, for its part acquiesced in the trial court's response and the characterization of the prosecutor's conduct during rebuttal as "completely inappropriate." We cannot replicate the trial judge's vantage point as an observer of the impact in the courtroom of the prosecutor's argument. Based on the record before us, and our deference to the trial court's judgment, *see Davis v. United States,* 564 A.2d 31, 35 (D.C.1989) (en banc), we conclude that the prosecutor's remarks coupled with the use of unnecessarily graphic photos of the corpse were improper.

Although the court had admitted the photographs into evidence, and they had been used in the trial, during rebuttal the prosecutor on more than one occasion thrust into the "face of each of the jurors," a one and a half foot high photograph, described by the trial court as "gory," of the decedent "lying in a huge pool of blood on the floor." In response, as defense counsel noted, at least two jurors were compelled to divert their eyes. The impact of the prosecutor's use of the photographs was heightened by the prosecutor's accompanying comment that the jury should return a verdict it could "live with." The message the prosecutor was sending to the jurors was clear. As the court interpreted, the jurors were being asked "how could you live with anything other than voting" guilty?

We agree with the trial court that the photographs were displayed during rebuttal for no apparent reason other than "to inflame the passion of the jury," further evidenced by the prosecutor's use of the

photographs during trial. The court also observed that during rebuttal, the prosecutor was "not making any point about ballistics or distances, or anything else, but presumably asking them [the jury] to render a verdict that they could live with." The prosecutor confirmed the trial court's assessment of his motivation when he responded, "I was showing the photograph because that's what this crime is about. Mr. Aun [sic] was killed brutally and that's the point."

 It is well settled that remarks directed to the emotions and prejudices of the jury, or calculated to arouse passion or inflame the jury, are improper and impermissible. *See, e.g., Diaz v. United States,* 716 A.2d 173, 180 (D.C.1998) (citing *Powell v. United States,* 455 A.2d 405, 410 (D.C. 1982)). In *Ford v. United States,* 487 A.2d 580 (D.C.1984), the court held that remarks of the prosecutor in conjunction with holding up a picture of the decedent before the jury were improper, but excused the conduct because it was in response to remarks made by the defense. *See id.* at 590–91. Here, although the prosecutor purported to be responding to the defense's closing that the jury should render a verdict it could "live with," defense counsel's remarks in closing emphasized the seriousness of the jury's responsibility[9] and the photographs were not used to counter any specific argument by the defense.

 We underscore that the prosecutor's comment and his confronting each juror with the graphic enlarged photographs of the shooting victim occurred during the government's rebuttal. Inappropriate comments by the government

---

9. During closing arguments, defense counsel concluded, "This is a steep responsibility. Make the decision you can live with everyday [sic] and sometimes when you wake up in the middle of the night because you won't have a chance to change it once you announce it to the Court."

"are looked upon with special disfavor when they appear in the rebuttal because at that point defense counsel has no opportunity to contest or clarify what the prosecutor has said." *Coreas v. United States,* 565 A.2d 594, 605 (D.C.1989) (quoting *Hall v. United States,* 540 A.2d 442, 448 (D.C. 1988)). The government's rebuttal in this case was designed to appeal to the emotions of the jury and improperly sought to influence the jury's assessment of appellant's guilt by suggesting that *someone* should be held responsible for what was done to the murder victim. The only person available to the jury was the appellant. We have no hesitation in concluding that the prosecutor's rebuttal argument was improper.

Given the lack of a timely objection by defense counsel, the court's curative instruction was not as effective as it would have been if counsel had timely alerted the judge and proposed a more specific instruction. By the time the trial court raised the matter *sua sponte,* the jury had heard the complete government rebuttal and seventeen transcript pages of instructions. The curative instruction was thus removed in time from the incident which had provoked it. *See Baldi v. Nimzak,* 158 A.2d 915, 917–18 (D.C.1960). Furthermore, the instruction was phrased in general terms, and gave a gentle caution to the jury that the "nature of the charges" should not affect the verdict, without specifically mentioning the prosecutor's objectionable use of the photographs and comments. Although the cautionary instruction given appears relatively mild when compared to the aggressiveness of the prosecutor's improper rebuttal, and there is a question whether it was sufficient to counter the prejudice from the prosecutor's improper argument, we need not arrive at a conclusive evaluation of its impact on the jury's verdict for

we decide that counsel's ineffectiveness in questioning a witness requires reversal.

## III. Ineffective Assistance of Counsel

Appellant contends that he was denied his constitutional right to effective legal representation because his attorney made several prejudicial errors during the course of the trial. His principal complaint is that trial counsel elicited an out-of-court identification of appellant made by Choi, which otherwise would have been inadmissible. In addition, he maintains that defense counsel's failure to object to the introduction of the enlarged photographs of the decedent and to the prosecutor's improper rebuttal, also amounted to ineffective assistance of counsel.

A claim of ineffective assistance of counsel presents mixed questions of law and fact. *Strickland,* 466 U.S. at 698, 104 S.Ct. 2052. We defer to any relevant findings of fact if they are supported by the evidence, *see Smith v. United States,* 686 A.2d 537, 547 (D.C.1996), *cert. denied,* 522 U.S. 839, 118 S.Ct. 115, 139 L.Ed.2d 67 (1997), but owe no deference on the ultimate question of law. *See Curry v. United States,* 498 A.2d 534, 540 (D.C.1985).

We apply *Strickland*'s familiar two-prong standard for evaluating claims of ineffective assistance of counsel. First, appellant must show that his defense counsel at trial committed errors "so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052. Second, appellant must prove prejudice that is "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable." *Id.* In other words, appellant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694, 104 S.Ct. 2052. "A reasonable

probability is a probability sufficient to undermine confidence in the outcome." *Id.*

### A. Facts Relevant to Choi's Identification of Appellant

*Pre-trial proceedings excluding the identification*

During the investigation of the shooting, Detective Wheeler showed Choi, the store owner and the only impartial witness to the shooting,[10] an array of nine photographs which included pictures of appellant and McGill. Choi picked out both men as the robbers, but qualified his identification of appellant by saying that the robber had longer hair than the person in the photograph.[11]

Choi was unable to make an in-court identification of appellant at a pretrial hearing, and the prosecutor therefore agreed not to ask Choi to make an in-court identification at trial. Choi's identification from the photo array was excluded *in limine* as "unusable," because the array was unduly suggestive.[12] The prosecutor also agreed not to use appellant's statement to Detective Wheeler that he had gotten "all of my hair cut off" a few days after the murder because, as the prosecutor conceded, without Choi's identification from the photo array, it was not relevant.[13]

A colloquy ensued during which the trial court confirmed that the prosecutor did

---

10. Kevin McGill witnessed the shooting, but was an admitted accomplice who had pled guilty to second-degree murder in return for his testimony and was awaiting sentencing. Since McGill risked prosecution for first-degree murder if he did not testify as agreed with the government, the jury could believe it was to McGill's advantage to implicate appellant as the instigator and shooter in the robbery.

11. Choi wrote out a statement in Korean to this effect. The English translation was read to the jury:

> The face looks familiar. I don't know for sure that he was the one who came in and robbed the store, but the face looks familiar. The robber's hair seemed a little longer than the one's [sic] in the picture.

12. Appellant and McGill are African–American men who were in their late teens at the time the photographs were taken. Both have medium to dark brown complexions. One had a light goatee and moustache at the time he was photographed. In addition to their pictures, the photo array included a picture of a pre-teen African–American boy and four African–American men significantly older than appellant or McGill, one with a full beard, one with a prominent gold tooth, and one with a very fair complexion. Also included in the array were one man of similar age,

but who weighed significantly more than either appellant or McGill, and one man who was not African–American. Furthermore, while five of the photographs were taken at different times and places, two pairs of photos, including the two of appellant and McGill, could be identified as a "set" having been taken in the same place, which could have indicated to a witness that they were related to the same case. The other such pair consisted of pictures of the man who weighed more than appellant and the non-black man. In other words, the composition of the array highlighted appellant and McGill as the perpetrators. *See Henderson v. United States*, 527 A.2d 1262, 1268 (D.C.1987) (focus of analysis is whether "something in photo array would have directed witness' attention to any particular individual") (citations and internal quotations omitted). The record does not reveal any attempt to have the identification determined to be reliable despite the array's suggestiveness.

13. During the pre-trial motions hearing the prosecutor said:

> The only time this [statement] would come up, the only way I think it would come up would be if for some reason the identifications by Mr. Choi became relevant. I don't anticipate eliciting that identification. I don't know what [defense counsel] would do to raise that issue.... It only becomes

not intend to elicit information about either Choi's identification or appellant's statement about the haircut in the government's case-in-chief. Defense counsel confirmed to his satisfaction that the prosecutor had prepared Choi sufficiently so that he would not inadvertently blurt out excluded information or give answers unless specifically asked. The trial court warned defense counsel, however, that if he asked questions about whether witnesses had been shown photographs, it would open the door to the introduction of Choi's identification of appellant from the photo array as well as appellant's statement about the haircut.

*Trial: Introduction of Choi's identification and appellant's corroborating statement*

At trial, the prosecutor acknowledged in his opening statement that Choi could not identify his assailants.[14] In the defense's opening statement, counsel told the jury that McGill was "one of the lowest characters" and would be the *only* person to identify Chatmon as a participant in the robbery.[15] He emphasized that Choi, "who was right there," could not identify appellant and that the jurors would be asked to find appellant guilty solely on McGill's word, the unreliable word of a cooperating felon awaiting sentence.[16]

In the government's case-in-chief, the prosecutor abided by the pre-trial agreement and asked Choi to describe the robbers rather than identify them. McGill

testified that appellant invited him to participate in the robbery, brought the gun to the store, and fired the weapon. He explained that he had pled guilty to second-degree murder for his role in the robbery and faced a significant sentence as a result.

Detective Wheeler testified about the two statements given by appellant. The prosecutor did not elicit any testimony about Choi's identification from the photo array or the statement appellant made to Wheeler about his haircut. Unexpectedly, near the end of the cross-examination of Detective Wheeler, defense counsel asked, "Have you tried to have anyone identify either Mr. McGill or Mr. Chatmon as the robbers?" Initially, Detective Wheeler responded that he did not recall, but counsel asked him to review his police reports to refresh his memory. The detective then responded that he had, and that Choi, "the guy on the scene at the time of the murder," had indeed identified appellant. Shortly thereafter, defense counsel continued, "Just one more question area, Mr. Wheeler. You said that Henry Choi made an eyewitness identification," and proceeded to ask the detective about Choi's written statement in Korean in which he had said that Chatmon's photograph looked "familiar" but that he could not be sure about the identification because the actual robber he had seen had longer hair.

The prosecutor, assuming the door had been opened, began to ask Detective

---

relevant if the identifications became relevant.

**14.** The prosecutor said:
Now Mr. Choi does not remember what the people who robbed him looked like. He can't tell you, he can't look at a face and tell you that's the guy. He can't tell you this is the man who robbed him. It happened fast. It happened a long time ago. But he can describe the two.

**15.** Defense counsel stated:

[Y]ou're going to hear that no one except for one witness can connect Carlton Chatmon with this crime, not Choi who was right there, not Walker who was across the street, not any of the police officers. Only one witness will testify Carlton Chatmon was at the robbery.

**16.** In the words of defense counsel:
Mr. McGill depends on what happens here today to learn how many years he is going to spend in the penitentiary.

Wheeler about Choi's identification of appellant and McGill from the photo array. Defense counsel did not object. Detective Wheeler then testified as follows:

He was shown nine photographs of individuals on similarity—looked similarly alike.[17] And he immediately, for some reason I remember this part, he immediately selected Mr. Chatmon and Mr. McGill because I noticed when he selected them he was like shaken. Because we had got their pictures so soon and he immediately picked them out.

The only thing I remember him saying about Mr. Chatmon is the guy who came in there seemed to have just a little bit more hair, maybe. Other than that, he says this is the guy. It looks like he has a hair cut or something he mentioned to me. But he was pretty sure.

Before the prosecutor could ask Detective Wheeler about appellant's statement regarding his haircut, the trial court *sua sponte* interrupted the examination and called both attorneys to the bench. The judge labeled the turn of events "bizarre." The prosecutor admitted that he was "very surprised" as well. The court chided the prosecutor for not approaching the bench prior to questioning to clarify that the ground rules for the examination had changed after the defense asked about Choi's identification. When defense counsel then objected to the admission of appellant's statement about the haircut, the trial judge overruled the objection and observed, "You opened this all up.... We had this all nailed down shut so nobody was going to hear a word about it."[18] The prosecutor proceeded to elicit testimony from Detective Wheeler that "Mr. Chat-

mon told me that he had his hair cut two days ago, which was two days prior to me interviewing him, which would have been about I guess July 10th, the day after the homicide, the day after the shooting." This statement fully explained Choi's hesitation in identifying appellant from the photo array, because the robber had longer hair (before the haircut) than the person in the photograph.

*Post-trial ruling on § 23–110 motion*

The government opposed appellant's § 23–110 motion claiming ineffective assistance of counsel, submitting defense counsel's affidavit explaining his trial strategy. At the hearing on appellant's § 23–110 motion, no evidence was taken, but the court heard arguments from counsel on what had happened during trial, focusing on the introduction of Choi's identification and the statement about the haircut. The trial court opened the discussion by describing its own thinking about the case, referring to defense counsel's questioning of Detective Wheeler several times as a "blunder," and discrediting his explanation about why he questioned Detective Wheeler about Choi's identification.

And I am very troubled about [defense counsel's] opening the door wide to reasonably powerful identification evidence. And the statement by the defendant, which underscored, strengthened the identification evidence. We had decided, with total clarity at the [pre] trial, that there would be no evidence of the photo identification, and that Mr. Chatmon's statement about getting his hair cut was not admissible on that plan for the litigation. And it was all done. And without any discussion, out of the clear

---

17. As noted, the photo array was highly suggestive. See *supra* note 12.

18. Appellant does not contend that the trial court erred in ruling that the identification

and statement became admissible once defense counsel had opened the door; we therefore express no view on the subject.

blue sky, and now rationalized as born of a need to impeach the detective, [defense counsel] flings wide the barn door. And inside the barn, is the government's ability to say, albeit with a suggestive array ... to come back with a photo identification by the complaining witness that is not positive, but is directed toward Mr. Chatmon ... what we would call a tentative identification. But it was qualified with regard to hair ... and then [the jury] ... get[s] to hear that Mr. Chatmon got his hair cut. And I think that's powerful evidence that harmed Mr. Chatmon.

\* \* \* \*

I remember, with great vividness, my astonishment and shock, when this happened in the courtroom when [defense counsel] did what he did about the identification evidence.... I remember being struck at the time by how remarkable this turn of events was in the courtroom.

The trial court declined to decide whether or not defense counsel's errors fell below the professional standard of the first prong of *Strickland,* 466 U.S. at 687, 104 S.Ct. 2052, but included in the discussion a fairly detailed analysis of that prong:

> [I]t seems to me if the rationale is so totally wanting that it doesn't pass must[er] under the first prong of *Strickland.* And I have to say that my current thinking is that although it's very close, I think that was such a grievous error, so insufficiently justified by the

explanation of the tactics, that it satisfied the first prong of *Strickland.* ... And if I had to decide it right now, I would say that he's [defendant has] met his burden under the first prong.

The trial court summarized its assessment of the closeness of the case, saying that "if the first prong [deficient performance] is difficult, the second prong [prejudice] is extremely difficult. And, in the end, I come out the other way, I think, although by the narrowest of margins." Concerning the prejudice prong, the trial court preliminarily expressed the view, before hearing from counsel, of what it considered the strengths of the government case: that McGill, the co-perpetrator, had not been "significantly impeached," [*id.*] and that appellant had given two "abruptly different versions" of his own conduct in statements to the police, one of which placed him outside the store during the robbery. The trial court did not consider that Walker's testimony was "terribly important," and the government essentially agreed with that assessment.[19] Appellant's counsel, however, challenged the notion that McGill had not been significantly impeached. He pointed out that the jury could well infer a strong bias from his plea agreement which did not include any minimum jail time and in which he waived his privilege against self-incrimination. Although counsel admitted that appellant's inconsistent statements to the police hurt him, he argued that, in the end, both statements were exculpatory.

19. THE COURT: Give us what you [the government attorney] think the trivial little side point of what you think Mr. Walker really adds to all of this.
GOVERNMENT COUNSEL: Well, it does seem trivial, your Honor, I'll admit because Walker—I get the sense reading the transcript that Walker wasn't all the government had hoped he'd be. I think that's pretty clear. I mean, you can almost hear the go ahead, Mr. Walker, in [the prosecutor's] voice even coming through the transcript. That was kind of obvious.
But what Walker does add—and I won't say that it's a great amount—but what Walker does add is just a basic corroboration of the wa[y] things happened in the robbery. And that's, to the extent that it outlined the actual actions to that extent.

The final oral ruling by the trial court is not on the record, and there is no written order. However, the substance of the trial court's reasoning is revealed in the discussions during the hearing. The closing discussion between the parties and the court that is on the record revolved around how to characterize the standard of review. The discussion caused the trial judge to excuse himself for a five-minute recess "to look at one more thing in *Strickland* that I'm having trouble finding here." He indicated that "for clarity to the appellate record, I will reveal a struggle that I'm going through" but that struggle was not, in the end, revealed.[20] It is clear from the trial judge's comments about counsel's deficient performance that the court intended to decide the case on the second prong of *Strickland*, finding that the prejudice was not enough to grant a new trial, but was unclear about how to characterize the standard he was applying to the evidence in this case. The court's comments immediately before recessing were:

> I think that Mr. Chatmon was entitled to better representation than he got. But that's not, in the end, in the last analysis, that's not the issue. I'm not free to redo first degree murder trials because I think they should have been done better. And I think this one should have been done better by a wide margin by the defense in this one area. But I think in the end I can't find the second prong of *Strickland* satisfied.

### B. *Analysis*

*Prong 1: Counsel's Performance*

 In evaluating counsel's performance, the reviewing court must indulge a strong presumption that counsel's conduct fell within a wide range of reasonable pro-

fessional assistance. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. "Trial tactical decisions generally do not result in a finding of ineffective assistance of counsel." *Zanders v. United States,* 678 A.2d 556, 569 (D.C.1996). This court does not second-guess trial counsel's strategic choices because "many alternative tactics are available to defense attorneys and their actions are often the products of strategic choices made on the basis of their subjective assessment of the circumstances existing at trial." *Id.* (quoting *Carter v. United States,* 475 A.2d 1118, 1123 (D.C.1984)). "[M]ere errors of judgment and tactics as disclosed by hindsight do not, by themselves, constitute ineffectiveness." *Lane v. United States,* 737 A.2d 541, 549 (D.C. 1999) (quoting *Curry,* 498 A.2d at 540). Appellant bears the burden of overcoming the presumption of counsel's competence. *See Strickland,* 466 U.S. at 689, 104 S.Ct. 2052.

In his affidavit prepared for the § 23–110 hearing, defense counsel explains that

> The defense strategy in this case was to isolate the cooperating codefendant as the only witness who could convict Mr. Chatmon and to show that his testimony was unreliable and therefore raised a reasonable doubt as to Mr. Chatmon's guilt. It was essential to show that there was no identification of Mr. Chatmon by anyone except McGill and that his testimony contradicted other witnesses.

Counsel states that in order to isolate McGill as the only identifying witness, he asked Detective Wheeler whether anyone else had identified appellant believing that Choi's statement was not an identification. Instead, defense counsel's question elicited

---

**20.** The transcript of the § 23–110 hearing ends after the judge excuses himself for five minutes saying he hopes to decide the case

that same afternoon. There is no further transcript of how the hearing concluded.

a response that Choi had, in fact, made such an identification from the photo array. Counsel relates that he then attempted to impeach Wheeler's testimony about Choi's identification with Choi's statement that he was unsure because of the robber's hair length, see *supra* note 11, but that this line of questioning "unavoidably" opened the door to appellant's statement that he had cut his hair after the robbery, before the picture was taken. The trial court, which recognized that its role was not to "substitute tactical judgments" for trial counsel, nevertheless said that this explanation "makes no sense."

The government makes several arguments in attempting to show that defense counsel's tactics do make sense. First, it surmises that defense counsel realized the trial was going so poorly for his client that he had to do something drastic to change its course. This "desperate measures" strategy, as the government calls it, was not mentioned by defense counsel in his affidavit. In another strategy, that elaborates on defense counsel's affidavit, the government suggests that defense counsel purposely questioned Detective Wheeler about the photo array to show that Choi could not identify appellant from even a suggestive photo array, and thus cast doubt on the government's case by questioning Detective Wheeler's truthfulness and investigative tactics.[21]

A threshold question arises whether, on appeal, we consider the adequacy of counsel's performance in light of any possible strategies that would explain defense counsel's actions, or whether we consider only those trial strategies and tactics that counsel actually embraced as

disclosed either in an affidavit, as in this case, or in testimony at a hearing. In *Strickland,* the Supreme Court explained that to satisfy the deficiency prong, the defendant must "show that counsel's representation fell below an objective standard of reasonableness," 466 U.S. at 688, 104 S.Ct. 2052, and "overcome the presumption that, under the circumstances, the challenged action '*might* be considered sound trial strategy.' " *Id.* at 689, 104 S.Ct. 2052 (quoting *Michel v. Louisiana,* 350 U.S. 91, 101, 76 S.Ct. 158, 100 L.Ed. 83 (1955)) (emphasis added). *Strickland* recognizes that there is a "wide range of reasonable professional assistance" and establishes a "strong presumption" that counsel has rendered adequate assistance. *Id.* From this language we could conclude that our evaluation is an objective one: if counsel's action could be justified by a sound trial strategy, it should not be considered deficient, even if it was not defense counsel's actual trial strategy. We are not persuaded that is the proper course here, however, because "a court deciding an actual ineffectiveness claim must judge the reasonableness of counsel's challenged conduct on the facts of the particular case, viewed as of the time of counsel's conduct." *Id.* at 690, 104 S.Ct. 2052. Moreover, just as we do not burden counsel's actual tactical choices with the benefit of "tactics as disclosed by hindsight," *Lane,* 737 A.2d at 549 (quoting *Curry,* 498 A.2d at 540), neither do we salvage them on that basis. Analysis under *Strickland* is highly fact bound and the presumption created by *Strickland* is simply that, a presumption, that can be overcome by the facts in a particular case. Therefore, once the record establishes the actual tactical explana-

---

**21.** This argument is based on the suggestive photo array, Detective Wheeler's characterization of Choi's selection of appellant's picture as an "identification" when counsel believed Choi's statement was too tentative for

such a label, and the fact that appellant's comment concerning his haircut (as reported by Detective Wheeler) was not included in either the written or videotaped statements of appellant.

tion for counsel's actions, the government is not free to invent a better-reasoned explanation of its own.[22]

■ In this case we have no difficulty concluding that trial counsel's questioning of Detective Wheeler, which led to introduction of Choi's identification from the suggestive photo array and to the admission of appellant's damaging statement about the haircut—all of which had been agreed pretrial were otherwise inadmissible—constitutes performance so deficient as to satisfy the first prong of *Strickland*. Up to that point, trial counsel's strategy was to show that McGill, who participated in the robbery and received a plea bargain for his testimony, was the only witness who could identify appellant. This was the defense that counsel presented to the jury from the outset of the trial, during opening argument. We focus on this strategy because whatever the other elements of its case, the government must always prove beyond a reasonable doubt that the defendant is the person who committed the charged crime. *See Brooks v. United States,* 717 A.2d 323, 327 (D.C.1998) (citing *United States v. Telfaire,* 152 U.S.App. D.C. 146, 149, 469 F.2d 552, 555, 559 (1972)). The introduction of Choi's testimony eviscerated the defense strategy to isolate and create doubt about the government's key witness against appellant.

The government argues that the "most damaging part of opening the door to this subject could not have been anticipated by

counsel" because counsel did not know that Detective Wheeler would testify that Choi had immediately identified appellant. This argument violates a cardinal rule of examination—if defense counsel did not know what Wheeler would say, he should not have asked. Moreover, from pretrial discussions defense counsel knew that questioning Wheeler generally about identifications could elicit a response about Choi's identification, which would open the door to the government's introduction of appellant's statement to Wheeler about getting his hair cut between the date of the shooting and the photograph used in the array.[23] The sequence of questions that would precipitate introduction of this evidence was carefully previewed by the trial court, and precludes surprise as an explanation for counsel's flawed trial strategy. Ultimately, even if counsel believed that Choi's statement was somehow less than a positive identification, it does not mean that it was *no* identification. Evaluated against counsel's express strategy to isolate McGill as the only person who identified appellant, the introduction of any other identification—even if tentative—was simply illogical and could only be counter productive.

*Prong 2: Prejudice*

Even if counsel's performance has been deficient, to obtain relief appellant must "show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would

---

22. The government's alternative "desperate measures" explanation does not provide much of an assist. As the trial court said, "Let's pull out a mallet and start bonking ourselves on the head because things are going badly?" When the prosecutor admitted that it was not a particularly helpful tactic, the court responded, "And I submit the first 30 lawyers coming out of the metro that we asked would have said that they wouldn't do it either." Although some creative strategies, entailing risk, might be reasonable if that is

the only option the defense has, this one is highly questionable.

23. We disagree with our dissenting colleague that appellant's statement about the haircut was made relevant by Choi's in-court testimony that one of the robbers had hair "a little bit long." People of all hair lengths get haircuts. The haircut—and its timing—was probative in the context of Choi's identification from the photo array. See *supra* note 11.

have been different." *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052. In assessing the prejudice to defendant, "the question is whether there is a reasonable probability that, *absent the errors,* the factfinder would have had a reasonable doubt respecting guilt." *Id.* at 695, 104 S.Ct. 2052 (emphasis added).

As we have already discussed, the record is not clear on how the trial court ultimately evaluated the prejudice prong. The court recognized that neither sufficiency of the evidence, nor a preponderance of a different outcome are the correct standard, *see id.* at 694, 104 S.Ct. 2052, but we do not have the benefit of the trial court's final evaluation of all of counsel's mistakes under the correct standard.[24] Nonetheless, our review of the prejudice prong is *de novo. See Woodard v. United States,* 738 A.2d 254, 257 (D.C.1999). We disagree with the trial court's conclusion that there was no *Strickland* prejudice.

■ Had trial counsel not caused the introduction of Choi's identification, he could have argued that the government's case rested solely on the testimony of McGill, a confessed participant in the crime who had a significant incentive to lie about who did the actual shooting. The judge instructed the jury that the testimony of accomplices is to be "received with caution and scrutinized with care." The trial court recognized the strength of this defense, noting at the post-trial hearing that without Choi's identification, defense counsel could isolate McGill as the only identifying witness. "[A]ll [defense counsel] has to do is stand up in closing argument. You don't have to do anything else." That

sound defense strategy was shattered once the jury heard that appellant had been identified by Choi, an unbiased eyewitness. Counsel's blunder not only introduced Choi's identification. Counsel further compounded his mistake when he sought to impeach Detective Wheeler with Choi's statement expressing some hesitation about his identification. All knew that the prosecutor had an effective response at hand: appellant's statement to the police about his haircut, which removed the basis for Choi's hesitation, strengthening his identification of appellant.

The government argues that its case was very strong and that, even without trial counsel's errors, conviction was assured. It asserts that McGill's testimony was convincing and in substance unimpeached because he clearly identified appellant as the man who shot Kwang Ahn; he told police where to find the murder weapon, and it was found there; he claimed to have a partner in the robbery and to having driven away with appellant after the robbery; and that Walker confirmed there were two men and saw a car drive off in the direction McGill claimed.

We do not share the government's assurance. The argument underscores that McGill was the heart of the government's case. As the trial court noted, the details of McGill's testimony that were confirmed by Walker were trivial, and government counsel conceded that his testimony was hesitant.[25] McGill's participation and, therefore, presumed first-hand knowledge of what transpired was not at issue. Thus, the fact that he was unimpeached with respect to these details was of little mo-

---

24. The trial court's consideration on the record, for example, does not include counsel's failure to object to the prosecutor's rebuttal, which the trial court had considered so improper as to require a *sua sponte* instruction.

25. Walker was the only person to have placed the gun in the hands of the person outside the store, presumably appellant. The jury, however, acquitted appellant of the firearm offense.

ment.[26] The only real question before the jury was the identity of the other participant. It was on this issue that isolating a biased McGill as the only witness who identified appellant was essential to the case, as defense counsel conceded. But this essential strategy was undone by the introduction of Choi's identification, an identification the reliability of which, for admissibility purposes, had never been determined. See *supra* note 12. The government contends that defense counsel was able to present the jury with flaws in the government's case, by arguing that Detective Wheeler was overzealous in focusing the investigation on appellant to the point of choosing a very suggestive photo array and, perhaps, even lying about appellant's haircut. These arguments, however, were not part of a defense strategy as much as they were necessary to contain the damage done by counsel's mistakes.

Conversely, the government's case gained significantly from Choi's tentative identification, when coupled with appellant's statement about the haircut. Whereas before Choi's identification from the photo array was introduced, the government could present only an allegedly biased accomplice's testimony to identify the second robber, Choi's identification added corroborating testimony from a witness who had no reason to lie. The jury heard from Detective Wheeler that Choi had "immediately" selected Chatmon and McGill from the photo array and was "shaken because he got [their] picture so soon and picked them out." As the trial court recognized, "that's important stuff. He goes right to the two of them. He's shaken. I remember it." Moreover,

Choi's tentativeness in identifying appellant from the photo array in all likelihood was perceived by the jury as a mark of his scrupulousness. Initially Choi was reluctant to confirm his identification of appellant, and in his Korean language statement said that he was not sure because the robber he saw had longer hair than the person in the picture he selected. See *supra* note 11. Choi's identification from the photo array may have been tentative, but appellant's statement about having his hair cut soon after the robbery provided a complete explanation for why Choi might not have been sure, because it showed that appellant did, in fact, have longer hair at the time of the robbery than in the photograph, which was taken after the robbery. This transformed a weak identification into a powerful one, corroborating McGill's story and his credibility. If McGill was at the heart of the government's case, Choi was its lynchpin. The government recognized this and—as Judge Farrell notes in his concurrence—emphasized Choi's identification during its closing and rebuttal arguments to the jury.

In considering a claim of ineffectiveness of counsel, we review the evidence at trial and "ask if the defendant has met the burden of showing that the decision reached would reasonably likely have been different absent [defense counsel's] errors." *See Strickland,* 466 U.S. at 696, 104 S.Ct. 2052. If we exclude Choi's identification from the evidence presented to the jury, we think there is a reasonable probability that the jury would have had a reasonable doubt as to appellant's guilt, and, thus, that the outcome of his trial would

---

**26.** Nor do we think that appellant's own inconsistent statements to the police as to his whereabouts during the robbery take the government's case as far as it need go to defeat *Strickland* prejudice. Although one of the statements reveals an intent to explain innocent presence close to the scene of the robbery and could lead to an inference of consciousness of guilt, both statements are at the core exculpatory.

have been different.[27]

*Reversed and remanded.*

FARRELL, Associate Judge, concurring in part and concurring in the judgment:

I agree that this conviction must be reversed for ineffective assistance of counsel. What the experienced trial judge described as a "grievous" misjudgment—or, as a practical matter, failure to exercise judgment—by defense counsel in opening the door to the photographic identification by Choi still warrants that description despite the government's effort on appeal to rehabilitate it. So, although ordinarily a single misstep by counsel should not be enough to make out deficient performance under *Strickland v. Washington,* 466 U.S. 668, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984), I concur with Judge Ruiz that counsel's performance in inviting an identification that contradicted the defense's own strategy of misidentification "fell below an objective standard of reasonableness." *Id.* at 688, 104 S.Ct. 2052.[1]

The issue of whether counsel's error creates "a reasonable probability that, but for

---

**27.** Appellant argues that trial counsel was also deficient because he failed to object to the admission of graphic photographs of the bloody corpse, and to the prosecutor's confronting the jury with the photographs during rebuttal as he commented that the jury should return a verdict they "could live with." That the photographs were graphic and, therefore, presented some risk of prejudice does not of course mean that they should have been excluded, since we have consistently upheld the admission of similar evidence on the ground that its probative value outweighed its prejudicial effect. *See Daniels v. United States,* 738 A.2d 240, 253 (D.C.1999) (citing examples). But whether or not appellant could have succeeded in having the photographs excluded altogether, counsel should have at least attempted to limit their use or manner of presentation.

The question whether to admit photographs as demonstrative evidence is within the trial court's sound discretion. *See (Alfred) Johnson v. United States,* 613 A.2d 888, 895 (D.C. 1992). We have held that the "fact that appellant did not dispute where the murder occurred does not render the photographs inadmissible so long as they were in some way relevant, either independently or as corroborative of other evidence." *Pittman v. United States,* 375 A.2d 16, 19 (D.C.1977) (citation omitted). The photographs at issue here, however, were neither independently relevant nor corroborative of other evidence. They were just bigger, closer, more gruesome depictions of evidence available and used by the medical examiner in less inflammatory renderings. The trial court has the duty to weigh the probative value of the photographs against any prejudicial effect they might have on the jury, and should not admit photographs if their primary purpose is to inflame the jury. *See id.* Without a timely objection, however, the trial court was not asked to expressly consider on the record the probative value or the potential prejudicial effect of the photographs.

Even assuming that defense counsel had no objection or did not think he could prevail in excluding the photographs altogether, vigilant defense counsel should remain alert to their improper use, particularly in rebuttal, when the jury is about to retire to deliberate. Counsel should have objected to the prosecutor's improper rebuttal and requested an immediate and more pointed curative instruction. But here, as we have already discussed, there was no objection at all and it was only the trial court's *sua sponte* intervention that led to a belated curative instruction. Because we decide that defense counsel's introduction of Choi's identification was sufficiently prejudicial to require reversal, we need not evaluate the prejudice resulting from these additional deficiencies in counsel's performance.

**1.** Unlike Judge Ruiz, *ante* at ——, I would not decide the question whether *Strickland*'s objective reasonableness standard permits *ex post* consideration of a tactic defense counsel might reasonably have had in mind even though it is not one he states he was pursuing. It is unnecessary to decide that issue because the government's proffered justifications for counsel's conduct here do not make out a reasonable trial strategy under any analysis.

[that] error[ ], the result of the proceeding would have been different," *id.* at 694, 104 S.Ct. 2052, is much closer. The Chief Judge is right that (as the trial judge recalled) the defense scored no knock-out blows in cross-examining McGill, the government's primary witness. But the truth is that we cannot know what impeachment weight the jury gave to his motive, as one awaiting sentence for the same murder, to furnish testimony acceptable to the prosecution; in a case such as this corroboration may be all-important. What gives me substantial pause on the issue of prejudice is the successive statements appellant himself gave the police which ended up putting him on the scene (outside the store), and could reasonably be taken by the jury as falsely exculpatory. Nevertheless, it is plausible for me to imagine the jury, or individual members of it, poised on the edge of reasonable doubt if that evidence—McGill's testimony and appellant's statements—were all the proof of guilt it had before it.[2] And the Choi identification provided a potentially clinching piece of corroboration by a witness with no motive other than to convict the actual killer of his friend. Choi's identification was uncertain, as the Chief Judge points out, but the prosecutor made much of it in both opening and rebuttal summation—in particular, exploiting appellant's admission to the police that he had later cut his hair, thus helping explain Choi's uncertainty. Besides spending two transcript pages of his initial closing on the identification,[3] the prosecutor returned immediately to it at the start of rebuttal, emphasizing that Choi "was a very careful man" who "could not be one hundred percent sure of the photo of Mr. Chatm[o]n because the subject he observed commit the robbery had more hair"—something explained by the

---

**2.** I discount, as the government did at the post-conviction hearing, the unspecific eye-witness testimony of Walker.

**3.** Now you remember Detective Wheeler testified about when Mr. Cho[i] looked at some photographs, and you will get to see the photographs. They weren't really discussed during the trial but you will get to see them, they are joint exhibits from the Government and from the Defense.

Mr. Cho[i] looked at those photographs and you will get to look at them closer yourselves. Now you can judge when you look at them how many of these photographs, how well these photographs look like the two people but Mr. Cho[i] picked out two photographs out of this group, these two photographs. And lo and behold, whose photograph did he pick out? Kevin McGill and Carlton Chatm[o]n.

And then Mr. Cho[i] told you that—he gave a statement in Korean because that's his native language and you will get to read what his statement said. The first picture he talked about was Mr. McGill's picture and he said "I'm not quite sure but the face looks similar to that of the robber whom I saw on the day I was robbed, but again, I am not so sure, the face looks very familiar, though." Well, guess what? Mr. Cho[i] was right when he picked out that very familiar face because Kevin McGill himself told you, yes, I was one of those two guys.

And then Mr. [Choi] picked out a second photograph and about that photograph he said, "The face looks familiar, I don't know for sure that he was the one who came in and robbed the store, but the face looks familiar. The robber's hair seemed a little longer than the one in the picture." Guess what again? That very familiar face appeared to Mr. Cho[i] for a reason and that reason is Kevin McGill told you was because this man was the man that helped him do the robbery and the murder.

Now Mr. Cho[i] said that the hair looked a little shorter. Remember what Detective Will had told you? When he spoke to Mr. Chatm[o]n on July 13th, four days after the murder, Mr. Chatm[o]n told him "I cut my hair two days ago." That would have been on July 11th. And so when Mr. Cho[i] said his hair looked longer at the time of the murder, he was right, his face was familiar for a reason because the evidence suggests beyond a reasonable doubt this was the man with the shotgun.

visit to the barber. The prosecutor went on to connect the identifications by Choi and McGill, as he had before, as mutually supporting:

> And, ladies and gentlemen, the photo spread may not be the greatest but it included the two people who committed this robbery, Mr. McGill tells you that. He is in that photo spread, and remember Mr. Cho[i] picked Mr. McGill's photo saying he looked familiar, and he was right, he was right.
>
> And when he said the same thing about Mr. Chatm[o]n looking familiar he was right because Mr. McGill told you Mr. Chatm[o]n was the second person.

It therefore cannot be said—and the prosecutor did not argue—that the government's case came down to the credibility of McGill unsubstantiated by Choi's identification.

If the test for prejudice under *Strickland* were whether it is "more likely than not" that Choi's identification made the difference between conviction and a jury conclusion of reasonable doubt, I would not vote to reverse. But, as the Court stated there, "The result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome." 466 U.S. at 694, 104 S.Ct. 2052. For me, the prosecutor's own recognition of the importance of Choi's identification confirms the required "reasonable probability," *id.*, that a different result would have occurred had defense counsel not opened the door to that evidence. The prejudice he thereby created is "sufficient to undermine confidence in the outcome." *Id.*[4]

Because we reverse on this ground, I do not associate myself with Judge Ruiz's treatment of the issue of the prosecutor's use of the photographs of the victim in closing argument, which has the character of lengthy dictum. It is enough to admonish, as the judge effectively did when he instructed the jury *sua sponte* not to be inflamed by the gruesome aspects of the case, that a prosecutor jeopardizes a conviction by excessive zeal in brandishing photographs of this sort while asking the jury "to make a decision that you can live with."

WAGNER, Chief Judge, dissenting:

Assuming that trial counsel was constitutionally ineffective, as the majority concludes, in my view, the trial court properly denied the motion for new trial on the ground of lack of sufficient prejudice under the *Strickland* standard. *See Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).[1] That standard requires a "showing that counsel's

---

4. If on subsequent analysis by the trial court, Choi's identification were found reliable and thus admissible despite what the prosecutor conceded was the glaring suggestivity of the photo array, reversal might seem—in retrospect—to have little point since appellant would again be confronted with the identification on retrial. But we obviously cannot anticipate the result of such an analysis, and what defense counsel's actions did was deprive appellant of the fruit of the prosecutor's apparent best judgment at the time that the identification was not admissible, or at least not in his interest to use.

1. In considering claims for new trial based upon claims of ineffective assistance of counsel, we need not determine counsel's ineffectiveness; "[i]f it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice ... that course should be followed." *Strickland, supra*, 466 U.S. at 697, 104 S.Ct. 2052. The able trial judge followed that course and declined to rule as ineffective trial counsel's decision to pursue a line of cross-examination which led to the disclosure of identification evidence which the government had agreed not to use unless the issue was raised by the defense.

errors were so serious as to deprive the defendant of a fair trial, a trial whose result is unreliable." *Id.* The case against Chatmon was strong. First, Chatmon was identified as the killer by a co-defendant, Kevin McGill, whose testimony, in the apt words of the trial court, "was not significantly impeached." The court factored in that the jury had before it evidence of McGill's plea agreement which allowed him to enter a plea to a reduced charge of second degree murder, however, as the trial court noted:

> McGill is not really tripped up. His story doesn't fall apart. There are no inconsistencies in it .... the defense didn't really lay a glove on Mr. McGill ... so we have a co-participant who says that [Chatmon] ... is the man who did this with me. And he says it to him face to face in an American courtroom in front of the jury and never backs off, and never wavers. And, as I say, I don't think he was significantly impeached.

Second, as the trial court also noted, the jury heard Chatmon's two "abruptly different versions" about his whereabouts and knowledge of the crime that he gave to the police. In the first statement, Chatmon provided an elaborate exculpatory story distancing himself from the crime scene and from McGill at the critical time.[2] In the second statement, which was video-taped, Chatmon claimed innocent presence at the scene of the crime where he only witnessed, from outside the store, McGill shooting the decedent.[3] Chatmon's inconsistent statements were strong evidence which could be considered by the jury as tending to prove consciousness of guilt. *See* Criminal Jury Instructions for the District of Columbia, No. 2.29 (4th Ed.1996). Further, they provide evidence of Chatmon's familiarity and association with a weapon which McGill said Chatmon used in the crime, his discussion of the intended robbery with McGill, his association with McGill and his presence at the scene of the crime.[4] Third, contrary to Chatmon's sec-

2. In the first statement taken by the police about four days after the crime, Chatmon said:

> I woke up at about 8:00 am, took out the trash and I seen my buddy Kevin [McGill] across the street from my house by the playground. He was pulling off and I started calling him but he did not hear me.
> Then I went back into the house and dozed off. I woke back up at about 11:45 am and ran into a friend of mine named Jeffrey. We went uptown and we did not come back until it started getting dark. When we got back everyone was saying someone had been killed in the neighborhood. I didn't pay any attention to what people was saying, and that was basically it.
> Chatmon also said that McGill acted suspicious after that time in that he did not come around regularly anymore. He also described two weapons which he said he had seen McGill with, a sawed-off shotgun and a rifle. He said that he had last seen the shotgun about July 6th and that he had shot the rifle before, but only touched the shotgun.

3. Chatmon gave the second statement after his arrest denying that he played any part in the robbery. However, in that statement, he admitted that McGill had asked him to help him commit a robbery, but McGill left without him because he had to do something. However, Chatmon said that he jogged to the store he thought McGill intended to rob, and saw McGill inside the store pointing a shotgun at the store's owner and another person who appeared to be with McGill. He stated that he saw McGill shoot a man and run out of the store with the other person, where both entered a Honda Accord and drove away fast.

4. The trial court considered this evidence in analyzing the prejudice prong of *Strickland*, noting:

> And aside from the abruptness of the change, which is something that a finder of fact could certainly weigh against Mr. Chatmon, where he ends up is right there. Right there on the scene, outside the store, watching for strange reason. He has ... made it clear that Mr. McGill is not lying

ond version of events at the store, a witness, Michael Walker, testified that he saw only one person standing in front of the store, who captured his attention by the way he was looking around, and that the person went around the corner, returned with a rifle and entered the store just before the witness heard the fatal shot. Walker, the citizen who called the police when he saw what was happening, dispels in his testimony any statement by Chatmon that he was outside of the store, but simply an innocent observer. Fourth, Henry Choi, the store owner, provided a general description of both men, including their relative sizes and the roles they played in the robbery and shooting. Both describe the heavier person as leaving with the gun. McGill testified that he weighed only 132 pounds and that Chatmon is the larger of the two.[5] Thus, the testimony of Choi and Walker in this regard tends to dovetail into the testimony of McGill. Considering the strength of the evidence, including Chatmon's own damaging statements, it cannot be said that there exists " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " *Frederick v. United States,* 741 A.2d 427, 437 (D.C.1999) (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052).

I am mindful that in *Frederick,* we recognized *Strickland's* teaching that " '[t]he result of a proceeding can be rendered unreliable, and hence the proceeding itself unfair, even if the errors of counsel cannot be shown by a preponderance of the evidence to have determined the outcome.' " *Frederick, supra,* 741 A.2d at 439 (quoting *Strickland, supra,* 466 U.S. at 694, 104 S.Ct. 2052). Nevertheless, what we have here is a showing that defense counsel, opened the door for the admission of a tentative out-of-court identification of Chatmon by a witness (Choi), who made no in-court identification. Choi testified that he could not identify the persons who robbed him and shot his friend. The evidence showed that when Choi selected Chatmon's photograph, he said, "The face looks familiar. I don't know for sure that he was the one who came in and robbed the store, but the face looks familiar. The robber's hair seemed a little longer than the one's in the picture." [6] Defense counsel argued in closing the uncertainty of the identification.[7] The uncertainty of Choi's

---

when he says that they are associates with each other. That Mr. McGill is not lying that they've spent time together, been in the car together.... But he lets the police know he's touched the gun for whatever reason. That he knows about the gun and has actually held it.

5. The jury, no doubt, could observe their relative sizes.

6. In light of Choi's description that one of the robbers had longer hair, there appears to be no reason why Chatmon's statement that he had cut his hair after the robbery would not have been admissible separate and apart from its relationship to the out-of-court identification procedure.

7. Defense counsel sought successfully to have Choi's written statement concerning his ef-

forts to make an identification admitted to show that, contrary to Investigator Wheeler's testimony, Choi did not make a positive identification. The trial court recognized at the time that the identification was not positive, stating, "I think [defense counsel] is right. I think [Choi] didn't make a positive identification." Defense counsel was able to argue in closing that there was no positive identification as follows:

... [Choi] said "I'm not sure. They look familiar, but I don't know for sure that he was the one who came and robbed the store but his face looked familiar." That is not a positive identification, ladies and gentlemen.

Close counts in horseshoes, not in homicide....

out-of-court identification weakens its value. This fact, and the strength of the evidence presented by the government, precludes the conclusion that Chatmon was prejudiced by trial counsel's claimed deficiency. "The likelihood ... that a strong case would be affected by deficiencies in representation is significantly less than it would be if the conviction were only weakly supported by the evidence." *Lane v. United States,* 737 A.2d 541, 551 (D.C. 1999) (citing *Strickland,* 466 U.S. at 696, 104 S.Ct. 2052). On this record, it cannot be said that the result of the trial is unreliable and that but for counsel's errors, there is a reasonable probability that the outcome would have been different, as required to show prejudice under *Strickland. See Strickland,* 466 U.S. at 694, 104 S.Ct. 2052; *see also Williams v. Taylor,* 529 U.S. 362, 394–95, 120 S.Ct. 1495, 146 L.Ed.2d 389 (2000). For these reasons, I respectfully dissent.